Thomas Noel O'SULLIVAN, individually, as executor of the estate of Julia Mary Walsh O'Sullivan, and as natural parent and next friend of Kieran O'Sullivan, Clodagh O'Sullivan and Aoife O'Sullivan, minors

v.

**RHODE ISLAND HOSPITAL et al.**

No. 2003–70–Appeal.

Supreme Court of Rhode Island.

May 26, 2005.

Howard B. Klein, Providence, for Plaintiff.

Maurene Souza, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

ROBINSON, Justice.

The appeal in this wrongful death case requires us to consider the applicability of the specific statute of limitations that is an integral part of our wrongful death statute against the background of a most unusual series of events that preceded the tragic death of the plaintiff's decedent. The result that we reach in this case is a function of the highly unusual fact pattern that is set forth in the record; we have dealt with that fact pattern with our attention constantly fixed on the relevant statutory language as construed pursuant to established principles of statutory construction.

This case first came before this Court on February 5, 2004, in accordance with an order directing both parties to show cause why the issues on appeal should not be summarily decided. After considering the arguments of counsel at that show-cause hearing, we determined that cause had been shown; and the case was therefore placed on the regular calendar for full briefing and argument. After considering the briefs that have been submitted and the oral arguments of counsel, we now reverse and remand the case for a trial on the merits.

### Facts and Travel[1]

---

1. For purposes of this appeal, the material facts that are pertinent to the issue before us

The plaintiff, Thomas Noel O'Sullivan,[2] is the widower of Julia Mary Walsh O'Sullivan, who died of pneumonia at the age of thirty-four, leaving three young children (Kieran O'Sullivan, Clodagh O'Sullivan, and Aoife O'Sullivan).

On February 8, 1999, Mrs. O'Sullivan was taken by ambulance to Newport Hospital, complaining of nausea, vomiting, decreased appetite and persistent fever. Before she was discharged from Newport Hospital that same day, she was rehydrated with a saline solution, and diagnostic tests were performed by that hospital.

The next day, Mrs. O'Sullivan was again transported by ambulance to Newport Hospital, with worsening symptoms. She was rehydrated as she had been on the previous day, but no new diagnostic tests were performed, and she was again discharged.

On February 11, 1999, Mrs. O'Sullivan was taken to Newport Hospital for a third time. Her symptoms were even worse than before, and this time she was admitted to Newport Hospital as a patient. While hospitalized, she was for the first time diagnosed as suffering from severe bilateral pneumonia and severe neutropenia.[3]

On February 12, 1999, Newport Hospital transferred Mrs. O'Sullivan to Rhode Island Hospital. She spent almost three weeks in the intensive care unit of Rhode Island Hospital, and she eventually died there on March 1, 1999.

Mrs. O'Sullivan's husband promptly obtained legal counsel in connection with his wife's untimely death; and on April 1, 1999, his attorney made a request to Rhode Island Hospital for Mrs. O'Sullivan's medical records. On June 8, 1999, plaintiff received from Rhode Island Hospital an "abstract" of the medical records. On June 28, 1999, having made a further request, plaintiff received the complete medical records from Rhode Island Hospital—including an autopsy report, which indicated that the "direct cause" of Mrs. O'Sullivan's death was "likely due to the bilateral bronchopneumonia and ARDS [Acute Respiratory Distress Syndrome]."

On November 4, 1999, plaintiff filed a wrongful death action against Newport Hospital and certain physicians affiliated with that hospital. But no action was commenced against the Rhode Island Hospital defendants[4] until June 6, 2002 (more than three years after the date of Mrs. O'Sullivan's death, but less than three years after plaintiff received the abstract of Rhode Island Hospital's medical records).[5]

After they were served, the Rhode Island Hospital defendants moved to dismiss

are not in dispute.

**2.** Although Mr. O'Sullivan brought suit in three separate capacities, we shall in this opinion refer to him in the singular.

**3.** The term "neutropenia" describes a condition in which the number of a type of white blood cell (neutrophils) in the blood is too low, making the patient more susceptible to bacterial infections.

**4.** By the term "Rhode Island Hospital defendants," we refer in this opinion to Rhode Island Hospital itself and to those certain physicians who were named in the complaint and who are affiliated with Rhode Island Hospital.

**5.** Rather than amending his pending complaint against the Newport Hospital defendants, plaintiff chose to sue the Rhode Island Hospital defendants for wrongful death in a separate action. (We note that the two hospitals are located in different counties.) The plaintiff subsequently filed a motion to consolidate the two cases, which motion was mooted by the Superior Court's grant of summary judgment to defendants in the later-filed action (which summary judgment is the subject of the instant appeal).

the case under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, asserting that the wrongful death action against them was time-barred pursuant to the three-year statute of limitations period set forth in Rhode Island's wrongful death statute, G.L.1956 § 10–7–2.[6]

The plaintiff objected to defendants' motion to dismiss, and filed an affidavit to support his objection. The court then converted the motion to dismiss into a motion for summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure. The plaintiff argued before the Superior Court (as he does before us) that the statute of limitations was tolled from the date of Mrs. O'Sullivan's death until at least the date of his receipt of the abstract of her medical records from Rhode Island Hospital.

The defendants argued in reply that the date of Mrs. O'Sullivan's death at Rhode Island Hospital was the date upon which the statute of limitations should be deemed to have begun running. They asserted that the statutory tolling provision of § 10–7–2 should not apply to this case because plaintiff had not met his alleged burden of proving that Mrs. O'Sullivan's injury was "latent or undiscoverable" at the time of her death. The defendants contend that Mrs. O'Sullivan's death itself was the injury which put plaintiff on notice that he should investigate with reasonable diligence any claims against potential defendants. They further argued that plaintiff failed to establish that he exercised reasonable diligence in bringing claims against all potential defendants within what defendants contend was the statute of limitations period—three years from the date of Mrs. O'Sullivan's actual death.[7]

After considering the oral and written arguments of counsel, the motion justice granted summary judgment in favor of the Rhode Island Hospital defendants on January 29, 2003. This appeal followed.

### Standard of Review

■ This Court reviews the granting of a summary judgment motion on a *de novo* basis. *Martellini v. Little Angels Day Care, Inc.*, 847 A.2d 838, 842 (R.I. 2004); *Pontbriand v. Sundlun*, 699 A.2d 856, 859 (R.I.1997). In so doing, we use the same criteria as the motion justice used. *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I. 1996); *O'Hara v. John Hancock Mutual Life Insurance Co.*, 574 A.2d 135, 136 (R.I. 1990). We will affirm a summary judgment if there is no genuine issue of material fact and we conclude that the moving party is entitled to judgment as a matter of law. *Alves v. Hometown Newspapers, Inc.*, 857 A.2d 743, 750 (R.I.2004).

■ Although we recognize that there are situations in which the viability of a particular statute of limitations defense will present a factual issue that must be resolved by the trier of fact, it is also true that there are many situations in which the

---

6. General Laws 1956 § 10–7–2 provides as follows:

"Except as otherwise provided, every action brought pursuant to this chapter shall be commenced within three (3) years after the death of the person. With respect to any death caused by any wrongful act, neglect or default which is not known at the time of death, the action shall be commenced within three (3) years of the time that the wrongful act, neglect or default is discover-

ed or, in the exercise of reasonable diligence, should have been discovered."

7. There is no dispute about the length of the statutorily mandated time within which one must sue. *See* § 10–7–2. Where the parties differ is with respect to the issue of when that statutory three-year period began to run for this plaintiff against the Rhode Island Hospital defendants.

question can be resolved in accordance with Rule 56 of the Rules of Civil Procedure. *See Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994) ("In an appropriate case, [Fed.R.Civ.P.] 56 can be employed to determine the applicability of a statutory time bar to a particular set of facts."); *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985) (recognizing that summary judgment should not be granted when there is "a viable issue of fact" about the beginning of the limitations period, but also stating that "cases involving statute of limitations defenses frequently lend themselves to summary disposition"); *see also Bader v. Alpine Ski Shop, Inc.*, 505 A.2d 1162, 1166 (R.I.1986). The case at bar is a case in which the Rule 56 option was entirely appropriate; there was no dispute between the parties as to the material facts, but rather only as to the legal conclusion to be drawn.

## Analysis

■ The issue before us is whether the carefully worded statute of limitations provisions contained in § 10–7–2 caused the three-year limitations period applicable to this case to be tolled from March 1, 1999 (the date of Mrs. O'Sullivan's death) until at least June 8, 1999 (the date on which plaintiff received an abstract of his wife's medical records from Rhode Island Hospital).[8]

■ In Rhode Island, the wrongful death statute provides that a wrongful death action ordinarily must be commenced within three years after the death of the person. *See* § 10–7–2 ("Except as otherwise provided, every action brought pursuant to this chapter shall be commenced within three (3) years after the death of the person."). Very significantly, however, the same statute also contains a tolling provision "[w]ith respect to any death caused by any wrongful act, neglect or default which is not known at the time of death * * *." *Id.* The statute goes on to provide that, in the latter situation, an action "shall be commenced within three (3) years of the time that the wrongful act, neglect or default is discovered or, in the exercise of reasonable diligence, should have been discovered." *Id.*[9]

8. It is important to bear in mind the distracting role played by the multiple trips of plaintiff's decedent to Newport Hospital in the early days of February 1999. It was only after Mrs. O'Sullivan's third trip to that hospital over a four-day period that an accurate (or partially accurate) diagnosis was made. As we shall explain, given this series of events centering around Newport Hospital, it was entirely logical that plaintiff's initial focus would be on the Newport Hospital defendants.

9. In Rhode Island, it is not necessary to have resort to any common law "discovery rule" in wrongful death cases in which statute of limitations issues are implicated. The General Assembly has made a clear policy option by expressly adding to the wrongful death statute language that, in effect, codifies (with some modifications) the common law discovery rule approach.

By contrast, several other jurisdictions lack such a statutory provision and therefore must resort to the common law discovery rule in dealing with assertions that statutes of limitations in the wrongful death context should be tolled. *See, e.g., Hanebuth v. Bell Helicopter International*, 694 P.2d 143 (Alaska 1984); *Collins v. Sotka*, 81 Ohio St.3d 506, 692 N.E.2d 581, 152 L.Ed.2d 331 (1998); *Bradshaw v. Soulsby*, 210 W.Va. 682, 558 S.E.2d 681 (2001).

It is our view that the affirmative action by our General Assembly in engrafting a specific statute of limitation provision onto the wrongful death statute constitutes a deliberate and meaningful signal by the lawmakers that the statute of limitations in the wrongful death statute should be liberally and equitably construed in order to help to effectuate the remedial goals that motivated the enactment of the statute's substantive provisions.

With respect to the wrongful death statute in its entirety, we are of the same mind as

Under the Rhode Island statute, with its explicit exception-recognizing language, the date of death of an individual is clearly not the measuring point in all cases. For this reason, we unhesitatingly reject the argument of the Rhode Island Hospital defendants that the fact of death *always* triggers the running of the wrongful death statute of limitations. Such a generalization is contrary to the plain meaning of the statute[10] and is far too procrustean to apply to the wide variety of situations that can present themselves. *See, e.g., Hanebuth v. Bell Helicopter International,* 694 P.2d 143 (Alaska 1984) (holding that the statute of limitation was tolled and the wrongful death claim did not accrue until the wreckage of a crashed helicopter and the bodies of decedents were discovered, some eight years after the fatal accident). Any irrebuttable judicial presumption that the fact of death automatically and always causes the wrongful death statute of limitations to begin to run would be unacceptable to us as being an overly rigid jurisprudential approach. Even in jurisdictions in which the common law discovery rule prevails, there has been a rejection of such a rigid approach. *See, e.g., Fure v. Sherman Hospital,* 64 Ill.App.3d 259, 21 Ill.Dec. 50, 380 N.E.2d 1376, 1386 (1978) ("We reject the idea that no wrongful death action can ever be brought more than 2 years after the plaintiff knows of the death in question * * * ."); *see also Praznik v. Sport Aero, Inc.,* 42 Ill.App.3d 330, 355 N.E.2d 686, 690 (1976). The anti-irrebuttable-presumption principle applies in an *a fortiori* manner in a jurisdiction like Rhode Island where the wrongful death statute itself provides for a "discovery" approach in appropriate circumstances.

Our decision in *Benner v. J.H. Lynch & Sons, Inc.,* 641 A.2d 332, 336–37 (R.I.1994), is not at all to the contrary. In *Benner,* we indicated that for automobile accidents the statute of limitations begins to run at death because "the traumatic event is immediately apparent to the participants or their legal representatives." *Id.* at 336. The opinion explicitly states that in that case "knowledge of possible wrongdoing by [the defendant] occurred either simultaneously or nearly immediately after Benner's death * * * ." *Id.* at 337. In this case, by contrast, plaintiff, at the time of Mrs. O'Sullivan's death, had no knowledge or reason to know of possible tortious acts by the Rhode Island Hospital defendants. Mrs. O'Sullivan died in a hospital to which she had been transferred after having

---

was the Supreme Court of Missouri when it made the following statement in its en banc decision in the case of *O'Grady v. Brown,* 654 S.W.2d 904, 907–08 (Mo.1983):

"Respondents assert that this statute must be 'strictly construed' because it is 'in derogation of the common law.' We do not agree. The wrongful death statute is not, strictly speaking, in 'derogation' of the common law. Derogation is defined as '[t]he partial abrogation or repeal of a law, contract, treaty, legal right, etc.' or as a 'lessening, weakening, curtailment, * * * impairment,' detraction or taking away of a power or authority. 3 Oxford English Dictionary 232 (1933). Wrongful death acts do not take away any common law right; they were designed to mend the fabric of the common law, not to weaken it. Remedial

acts are not strictly construed although they do change a rule of the common law."

**10.** Rhode Island's statutory enactment of the discovery rule approach is to be contrasted with those jurisdictions in which the legislature has expressly indicated when the cause of action for wrongful death shall be deemed to have accrued as a matter of law. The approach adopted by the Rhode Island statute should be contrasted, for example, with New Mexico's wrongful death statute, which specifically states: "The cause of action accrues as of the date of death." N.M. Stat. Ann. § 41–2–2 (Michie 1978); *see Clark v. Lovelace Health Systems, Inc.,* 136 N.M. 411, 99 P.3d 232 (2004).

been seen on three occasions at another hospital for a progressively worsening illness. Unlike a death occurring as the result of an automobile accident, it simply is not plausible to assert that Mrs. O'Sullivan's death at Rhode Island Hospital (to which she had been transferred *after multiple fruitless trips to Newport Hospital*) should have put plaintiff on immediate notice that the Rhode Island Hospital defendants were potential tortfeasors.

It is true that the plaintiff in this case knew, or had reasonable cause to suspect, on the date of her death (March 1, 1999), that Mrs. O'Sullivan was the victim of a wrongful death. *See* § 10–7–2. What plaintiff did not have at that time, however, was any reason to suspect that a person or entity other than the Newport Hospital defendants might also have committed a "wrongful act, neglect or default" in the occurrence of that injury. *See id.* It is our interpretation of the undisputed facts that the now-alleged role of the Rhode Island Hospital defendants in connection with some "wrongful act, neglect or default" with respect to Mrs. O'Sullivan's death was not known at the time of

her death. Therefore, pursuant to § 10–7–2, the statute of limitations could be tolled until "the time that the wrongful act, neglect or default is discovered or, in the exercise of reasonable diligence, should have been discovered."

■ The Rhode Island Hospital defendants further argue [11] (and the motion justice agreed with this argument) that the tolling provision of § 10–7–2 applies only when the injury is latent and potentially undiscoverable. An injury is latent and potentially undiscoverable when plaintiff, exercising "reasonable diligence" at the time of the injury, is unable to discover the wrongful act, neglect or default. *See, e.g., Meyette v. Leach*, 651 A.2d 1229, 1229 (R.I.1994) (applying the latent and potentially undiscoverable requirement to an action under G.L.1956 § 9–1–14.1).

Contrary to these assertions, however, we conclude that no such prerequisite for tolling can be found in the plain language of the statute of limitations that is an intrinsic part of our wrongful death statute.[12] *See* § 10–7–2. The language in the

---

**11.** The defendants have also argued that, in order to toll the statute of limitations, plaintiff must prove that the wrongful act, neglect or default was not known at the time of death *and* could not have been discovered by plaintiff, in the exercise of reasonable diligence, *within three years from the time of death.* It appears that defendants have erroneously relied upon an earlier version of § 10–7–2. *See* P.L. 1982, ch. 435, § 1. That version stated in pertinent part:

> "[E]very such action shall be commenced within three (3) years after the death of such person * * *. It is further provided, however, that *in respect to any death caused by any wrongful act, neglect or default which could not in the exercise of reasonable diligence be discoverable within three (3) years after the death of such person,* an action hereunder shall be commenced within three (3) years of the time that the wrongful act, neglect or default should, in

the exercise of reasonable diligence, have been discoverable." (Emphasis added.)

In 1984, § 10–7–2 was amended so as to add its present language, thereby repealing the language that permitted tolling only when the wrongful act, neglect or default "could not in the exercise of reasonable diligence be discoverable within three (3) years" after the death occurred. *See* P.L. 1984, ch. 237, § 1.

**12.** The question of whether the alleged "injury" was "latent [and] undiscoverable" at the time of the occurrence that caused the injury, is often an issue in malpractice actions, which are governed by G.L.1956 § 9–1–14.1. *See, e.g., Meyette v. Leach*, 651 A.2d 1229, 1229 (R.I.1994) (declining to toll statute of limitations in medical malpractice action when "the alleged negligence was neither latent nor undiscoverable" and could have been discovered "if plaintiff had exercised reasonable diligence *at the time of his wife's death*" because "[a]ll of the records * * * were available to

wrongful death statute should be contrasted with that contained in the statute of limitations governing malpractice cases—*viz.,* § 9–1–14.1, which provides in pertinent part:

"[A]n action for medical * * * malpractice shall be commenced within three (3) years from the time of the occurrence of the incident which gave rise to the action; provided, however, that:

" * * *

"(2) In respect to those *injuries or damages* due to acts of medical * * * malpractice *which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action,* suit shall be commenced within three (3) years of the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered." (Emphases added.)

Under the plain language of § 9–1–14.1, in order to toll the malpractice statute of limitations, there must be a finding that the plaintiff exercised reasonable diligence at the time the injury occurred, yet *failed to discover* a wrongful act on the part of the defendant. *See Grossi v. Miriam Hospital,* 689 A.2d 403, 404 (R.I. 1997) (holding that the tolling provision of § 9–1–14.1 did not apply when the plaintiff knew that medical negligence may have contributed to her husband's death, but asserted that she did not know the identity of the doctor who treated him).

In contrast, the tolling provision contained in § 10–7–2 has no such requirement. All that is required under this statute is a finding that the death was "caused by any wrongful act, neglect or default which *is not known at the time of death.*" (Emphasis added.) The statute is then tolled until the date on which the "wrong-

ful act, neglect or default is discovered or, in the exercise of reasonable diligence, should have been discovered." The plaintiff then has the full three-year statutory period from that actual or imputed date of discovery within which to file his or her complaint.

In short, the exercise of reasonable diligence is not a prerequisite to *tolling* under § 10–7–2 in the same manner as it is under § 9–1–14.1. Therefore, § 9–1–14.1's requirement that a plaintiff be found to have exercised reasonable diligence at the time the injury occurred, yet *failed to discover* a wrongful act on the part of the defendant (defined by this Court as latent and potentially undiscoverable) is inapplicable to § 10–7–2. Instead, § 10–7–2 indicates that the statute of limitation is automatically tolled when the "wrongful act, neglect or default" "is not known at the time of death" and it is the actual (or imputed) discovery of the "wrongful act, neglect or default" that *triggers* the *running* of the statute.

To the extent that some language in our holding in the case of *Trudeau v. Dupre,* 640 A.2d 534, 535 (R.I.1994) may arguably be inconsistent with this opinion, we no longer rely upon it as authoritative. In that case, we held that the tolling provisions of both § 9–1–14.1 *and* § 10–7–2 were unavailable to the plaintiffs (parents of a deceased unborn child), who asserted that they did not know about an allegedly wrongful act on the defendant's part. We held that the alleged malpractice on the part of the defendant was "neither latent nor potentially undiscoverable" because, had the plaintiffs exercised reasonable diligence at the time of their child's death, any act of negligence on the defendant's part could have been discovered within the three-year period. *Trudeau,* 640 A.2d at

plaintiff and his counsel"). (Emphasis added.)

535. That language was overly broad to the extent that it related to § 10–7–2's tolling provision. (It should be noted, however, that our holding in the case at bar would not have altered the outcome in *Trudeau.*)

It is our conclusion on the basis of the undisputed facts that any alleged wrongful act on the part of the Rhode Island Hospital defendants was not known to plaintiff at the time of Mrs. O'Sullivan's death. Nothing in the record indicates that plaintiff had any reason to suspect, at the time that he decided to sue the Newport Hospital defendants, that the Rhode Island Hospital defendants were also potential tortfeasors. Above all, it is important to be mindful of how entirely rational it was for plaintiff to believe that the fault (if any) that resulted in the death of Mrs. O'Sullivan must have been attributable the Newport Hospital defendants. On three separate occasions over a four-day period, Mrs. O'Sullivan was taken to that hospital. On the first two of those occasions, she was not even admitted; but, after each visit, her symptoms became increasingly worse. If the well-known maxim about hoofbeats and zebras [13] has any applicability, it would certainly be to a situation like this. The red flags as to the Newport Hospital defendants were so dominant that it was not at all illogical for plaintiff to opine at the outset that the Newport Hospital defendants must have been the only potential tortfeasors; [14] and our wrongful death statute, as we understand it, did not require that plaintiff take more immediate preemptive action than he in fact took. In

a very understandable way, the highly unfortunate events of February 1999—events that centered around Newport Hospital—served to concentrate the initial attention of plaintiff and his counsel on that institution. The logical initial focus of the rational person would, it seems to us, have been on the local hospital to which plaintiff's decedent was taken on several occasions before she was eventually referred to the larger teaching hospital in Providence. There was no reason for plaintiff initially to believe that he should inquire beyond the local hospital to which Mrs. O'Sullivan had thrice been transported.

We are not persuaded by defendants' argument that, because "there is always a delay in securing medical records," plaintiff's argument implies that the discovery rule would always be availing in all wrongful death cases. In the usual situation, the plaintiff would be aware of the wrong (or the reasonably suspected wrong) at or immediately following the death and would know at that time which defendants should be named. *See Benner,* 641 A.2d at 336.

 Contrary to defendants' suggestion, we are *not* suggesting that the statute of limitations in the wrongful death context is always tolled until such time as the appropriate representative of the deceased actually receives pertinent data relative to a possible tortfeasor (in this case hospital records relative to the decedent's hospitalization and death). Our holding here is narrower: when virtually all available evidence indicates that the tort (if any) in all likelihood was caused by one

---

13. "If you hear the sound of hoofbeats, don't assume that it is a herd of zebras." (The origin of this maxim has been traced to Dr. Theodore E. Woodward, Emeritus Professor of Medicine at the University of Maryland, and it is commonly used in the medical community as an admonition against too quickly opining that a patient is suffering from a rare

or unusual illness—because a common ailment is far more likely to be the cause.)

14. It should go without saying that we express no view at this point in time as to whether there actually was negligence on the part of the Newport Hospital defendants or the Rhode Island Hospital defendants.

particular entity or person, the plaintiff is not obliged to beat the bushes at the first conceivable opportunity in an attempt to locate yet more possible tortfeasors. Therefore, as applied to this case, the statute did not begin to run until at least such time as the decedent's representative received the abstract of Mrs. O'Sullivan's medical records from the second hospital.[15]

We would add that we have been guided in our approach to this case by a significant decision of West Virginia's highest court in the case of *Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 487 S.E.2d 901 (1997).[16] In that case, the Supreme Court

of Appeals of West Virginia addressed the application of the discovery rule to a medical malpractice action in which the plaintiff knew of the existence of his injury, but did not know that the injury was "the result of any party's conduct other than his own." *Id.* at 908.

That court held that a plaintiff must not only have known of the injury sustained and the identity of the allegedly negligent party, but must also have known of the causal relationship between the two before the statute of limitations might be allowed to run. *Id.* at 909. In *Gaither*, the plaintiff knew that the physicians at City Hos-

---

**15.** We have no doubt as to plaintiff's diligence in seeking medical records from Rhode Island Hospital. It is also our opinion that plaintiff had the full statutory period (three years) after he received the abstract of Mrs. O'Sullivan's medical records within which to commence an action. There is no sound reason for giving this plaintiff less time within which to sue than would have been available to a wrongful death plaintiff who did not have to seek refuge in the statute's tolling provisions. The very purpose of the tolling statute is to exclude the time period during which plaintiffs are reasonably unaware of the injury or its cause in order to ensure that such plaintiffs have "essentially the same rights" as those whose cause of action is immediately ascertainable. *Szpynda v. Pyles*, 433 Pa.Super. 1, 639 A.2d 1181, 1183 (1994).

**16.** The facts of the *Gaither* case are especially instructive for our purposes. *Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 487 S.E.2d 901 (1997). In that case, the plaintiff had lost control of his motorcycle on a "rain-slick" road in West Virginia on October 17, 1989, and, as a result, became involved in a single-vehicle accident, in which he severely fractured his right leg. Paramedics transported him to City Hospital in Martinsburg, West Virginia. Over five hours later he was transferred by ambulance to the Maryland Institute for Emergency Medical Services Systems ("Shock Trauma") in Baltimore, Maryland. *Id.* at 903–04. When the plaintiff arrived at Shock Trauma, the doctors there discovered that he had no pulse in the lower part of his injured leg. The doctors attempted to rees-

tablish blood flow to the leg. They were unsuccessful in their effort, however, and the plaintiff's right leg was then amputated above the knee. *Id.* at 904.

After the surgery, Shock Trauma physicians told the plaintiff's parents that City Hospital's delay in transporting the plaintiff to Shock Trauma may have caused the loss of his limb. Significantly, however, the plaintiff's parents never communicated this information to the plaintiff. *Id.* It was not until the plaintiff visited a prosthetic specialist on January 6, 1993, that he learned that amputations may result from trauma or loss of circulation. After discussing this information with his parents, the plaintiff learned of his parents' prior conversation with the Shock Trauma physicians. He then contacted an attorney, who requested copies of his client's medical records. *Id.* The plaintiff filed a malpractice action against City Hospital in January 1994 (over four years after the date of the accident). City Hospital then filed a motion for summary judgment, citing the applicable statute of limitations, which motion was granted. *Id.* at 905.

The plaintiff appealed, and the Supreme Court of Appeals (West Virginia's highest court) reversed. The court held that, although the plaintiff knew at the time his leg was amputated that he had suffered an injury and that City Hospital had owed him a duty of care while he was in its care, there was no evidence that the plaintiff had any reason to know or suspect until January 1993 that City Hospital may have breached its duty. *Id.* at 910.

pital in Martinsburg, West Virginia, had treated him before he was transferred to the Maryland Institute for Emergency Medical Services Systems ("Shock Trauma") in Baltimore, Maryland. The decision of the West Virginia court strongly implies, however, that the plaintiff was justified in his initial belief that the amputation of his leg was solely the result of his motorcycle accident and not the result of any act or neglect on the part of City Hospital.

We are of the opinion that an analogous approach is reflected in the plain language of § 10–7–2 and should be utilized by this Court.

We also are satisfied that our holding in this case is consistent with sound policy considerations. A key consideration for a litigator when there has been a death that may have been wrongful is ascertaining who should be sued. The shotgun approach (*i.e.*, sue anyone who might in any even remotely conceivable scenario have had a causal role in the death) probably would have obviated the problem with which we are presently faced, but it also

would cause great disruption on the part of many.[17] Accordingly, the law should not require:

> "[A] patient to assume that his medical provider has committed malpractice or worse, has engaged in a conspiracy to conceal some misconduct every time medical treatment has less than perfect results." *Gaither*, 487 S.E.2d at 910.

Even if we had some hesitation about the correctness of our holding in this case (which we do not), we would be inclined to opt for a liberal approach[18] to the statute of limitations because of the remedial nature of the wrongful death statute. *See, e.g., Bradshaw v. Soulsby*, 210 W.Va. 682, 558 S.E.2d 681, 686 (2001) ("We have repeatedly recognized that because the wrongful death act alleviates the harshness of the common law, it is to be given a liberal construction to achieve its beneficent purposes."); *see also Hanebuth*, 694 P.2d at 147 (observing that "[it] is profoundly unfair to deprive a litigant of his right to bring a lawsuit before he has had any reasonable opportunity to do so").[19]

---

17. Indeed, a plaintiff's attorney who casts his or her net too broadly could be met with a motion for Rule 11 sanctions, and the attorney's client could even be met with an action for malicious prosecution. *See Foil v. Ballinger*, 601 P.2d 144, 148 (Utah 1979) (stating, with respect to a malpractice statute of limitations, that judicial adoption of a construction of that statute that would encourage "a person who experiences an injury, dysfunction or ailment, and has no knowledge of its cause, to file a lawsuit against a health care provider to prevent a statute of limitations from running is not consistent with the unarguably sound proposition that unfounded claims should be strongly discouraged").

18. *See* discussion *supra* note 9.

19. A useful statement about the purpose of statutes of limitations occurs in the California Supreme Court's opinion in *Kaiser Foundation Hospitals v. Workers' Compensation Appeals Board*, 39 Cal.3d 57, 216 Cal.Rptr. 115,

702 P.2d 197 (1985). It reads as follows: "The purpose of any limitations statute is to require 'diligent prosecution of known claims thereby providing necessary finality and predictability in legal affairs, and ensuring that claims will be resolved while the evidence bearing on the issues is reasonably available and fresh.' " *Id.* at 200 (quoting *Kaiser Foundation Hospitals v. Workers' Compensation Appeals Board*, 19 Cal.3d 329, 137 Cal.Rptr. 878, 562 P.2d 1037, 1040 (1977)). It is understandable why the law favors the diligent prosecution of known claims. It must be emphasized, however, that the key to the instant case lies in the fact that plaintiff's claim against the Rhode Island Hospital defendants was not a "known" claim (nor was it reasonably knowable) until at least the time when plaintiff received the abstract of the medical records from Rhode Island Hospital.

A leading treatise on statutory construction has made the following pertinent observation: "[Wrongful death statutes] * * * represent a remedial policy that has become firmly

## Conclusion

For the reasons stated herein, we reverse the judgment of the Superior Court. The record shall be remanded to the Superior Court.

imbedded in modern jurisprudence. Where the extent of the damages recoverable for wrongful death is measured by the actual injury sustained, these statutes should be liberally construed to accomplish their remedial purpose. But.many of the decisions in the past, and a few of the later ones as well, have crippled the operation of this legislation by employing a narrow construction on the basis that these statutes are in derogation of the common law. The modern authorities are in agreement that the objectives and spirit of this legislation should not be thwarted by a technical application." 3A *Sutherland Statutory Construction* § 71.05 at 271 (Norman J. Singer 5th ed.1992).