**Supreme Court**

No. 2016-58-Appeal.
No. 2016-59-Appeal.
(KC 05-161)

Maureen O'Connell et al.　　　　:

v.　　　　　　　　　:

William Walmsley.　　　　:

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2016-58-Appeal.
No. 2016-59-Appeal.
(KC 05-161)

Maureen O'Connell et al.          :

v.                                :

William Walmsley.                 :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  This appeal emanates from a tragic automobile accident that occurred on the evening of March 9, 2003, in Coventry, Rhode Island.[1]  Maureen O'Connell and Paul Roberti (plaintiffs) challenge the hearing justice's grant of summary judgment in favor of William Walmsley (Walmsley or defendant).  This matter came before the Supreme Court on March 8, 2017, pursuant to an order directing the parties to appear and show cause why this Court should not summarily decide the issues raised by this appeal.  After hearing the arguments of counsel and reviewing the memoranda submitted on behalf of the parties, we are satisfied that cause has not been shown.  Thus, further briefing or argument is not required to decide this matter.  For the reasons outlined herein, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

At about 10:30 p.m. on March 9, 2003, Jason Goffe (operating a Toyota Corolla) and Michael Petrarca (operating a Ford F-350) were high-speed racing on the New London Turnpike

---

[1] The facts pertinent to this case are outlined at length in O'Connell v. Walmsley, 93 A.3d 60 (R.I. 2014).

in a westerly direction. Also present in Goffe's car was passenger Brendan O'Connell Roberti. After losing control of his vehicle, Goffe whirled into the eastbound lane. At this juncture, Walmsley, who had been driving his vehicle eastbound, struck Goffe's vehicle. This tragedy resulted in the deaths of Goffe and Roberti.

The plaintiffs (Roberti's parents), in their capacities as co-administrators of Roberti's Estate, initiated suit against several defendants, including Walmsley. The plaintiffs also sued Donald Goffe, Goffe's father, who owned the vehicle he drove, and Geico General Insurance Company (GEICO), which insured the same vehicle. Moreover, Walmsley joined Petrarca and Tapco, Inc., which owned the truck driven by Petrarca, by way of a third-party complaint for indemnification and contribution alleging that Petrarca's negligence was a contributing cause of Roberti's death.

Donald Goffe and GEICO settled with plaintiffs prior to trial for $145,000 (Goffe Release) whereby plaintiffs released both parties from future-damages claims stemming from the accident. Additionally, plaintiffs agreed that all potentially recoverable claims by plaintiffs were "hereby reduced by the statutory pro rata share of negligence of * * * Goffe * * * under the Uniform Contribution Among Joint Tortfeasors Act of the State of Rhode Island, or the sum of * * * $145,000 * * * whichever is the greater reduction." Similarly, before trial, plaintiffs entered into a settlement agreement with Petrarca and Tapco, Inc. for $250,000 (Petrarca Release), which released Petrarca and Tapco, Inc. from future claims arising out of the accident. In the Petrarca Release, plaintiffs also promised to reduce "any damage recoverable by [p]laintiffs against all other persons * * * jointly or severally liable" to plaintiffs by the "pro rata share of liability of [Petrarca and Tapco, Inc.] * * * or in the amount of the consideration paid" under the agreement, "whichever amount is greater[.]"

Because of the settlement releases, Walmsley was the sole defendant who advanced to trial, which began on June 21, 2010. The defendant moved for judgment as a matter of law at the conclusion of plaintiffs' case; however, the trial justice reserved ruling on the issue to permit the case to go before the jury. On July 2, 2010, the jury found Walmsley negligent and deemed his negligence a proximate cause of Roberti's death. The jury also apportioned fault among each driver and deemed Walmsley 3 percent at fault.[2] The jury assessed the estate's total damages and awarded $10,000 against Walmsley without modifying this figure to account for liability percentages.

The defendant then renewed his motion for judgment as a matter of law, which the trial justice granted. The plaintiffs moved for a new trial and an additur. Specifically, plaintiffs cited G.L. 1956 § 10-7-2 to request an additur to $250,000—the statutory minimum corresponding with wrongful-death cases. The trial justice ruled conditionally that, if defendant's motion for judgment as a matter of law was overturned on appeal, he would grant plaintiffs' motion for an additur. Alternatively, the trial justice ruled that, if plaintiffs did not accept the additur, he would grant their motion for a new trial with respect to both damages and liability. On September 22, 2010, judgment entered for defendant. The plaintiffs timely appealed, with the sole issue on appeal being the trial justice's grant of defendant's motion for judgment as a matter of law. This Court vacated the Superior Court's judgment and remanded the case for additional proceedings.[3]

On remand before a different justice, plaintiffs sought judgment for $250,000 entered against Walmsley per the additur. Conversely, Walmsley moved for summary judgment and sought a finding by the Superior Court that he was not required to pay any sum to plaintiffs, based on the two releases that he asserted fully satisfied the damages award.

---

[2] The jury also assigned Petrarca 3 percent fault and Goffe 94 percent fault.
[3] O'Connell, 93 A.3d at 68.

The plaintiffs asserted that § 10-7-2 mandated a finding that defendant was liable to them for at least $250,000, irrespective of the minor percentage of fault attributed to defendant and the other sums received under the Goffe and Petrarca Releases. The plaintiffs further averred that G.L. 1956 § 10-6-7, which governs the "[e]ffect of release of one tortfeasor on [the] liability of others[,]" did not mandate a reduction in damages upon a joint tortfeasor's release. Instead, plaintiffs suggested that the language of the applicable releases governed only the effect of a joint tortfeasor's release, if any. Lastly, plaintiffs argued that, because they read § 10-7-2 as a special provision that contradicted § 10-6-7, which they described as a general provision, § 10-7-2 prevailed and rendered Walmsley liable for the $250,000 minimum.

In contrast, Walmsley asserted that the court should enforce the clear contractual language of the Goffe and Petrarca Releases, which he averred would reduce his payment obligation to plaintiffs as an "other tortfeasor[]." Walmsley further posited that, because plaintiffs had already received aggregated damages in excess of $250,000, reducing his liability under § 10-6-7 would not defy the minimum recovery provision in § 10-7-2.

In a written decision filed on May 6, 2015, the hearing justice found that the Goffe and Petrarca Releases fully satisfied the judgment against Walmsley. He began with the premise that a court does not interpret a statute literally when doing so leads to an absurd result. With respect to the legislative intent of § 10-7-2, the hearing justice opined: "Based on the remedial and compensatory nature of the statute and damages principles generally, it is clear that the purpose of the minimum damages requirement in § 10-7-2 is to provide a fixed, baseline recovery amount for any wrongful death plaintiff." The hearing justice relied on Petro v. Town of West Warwick ex. rel. Moore, 889 F. Supp. 2d 292 (D.R.I. 2012), a federal district court decision that grappled with the identical statutory interpretation. He concluded that the purpose of the minimum-

damages requirement—namely, to fairly compensate wrongful-death plaintiffs—had been satisfied because plaintiffs received an amount in excess of the statutory minimum. Further, the hearing justice emphasized that adoption of plaintiffs' reading of § 10-7-2 would create an absurd result, to wit a plaintiff's recoverable amount would hinge on the number of tortfeasors in a given case—an outcome, he concluded, that the Legislature certainly did not intend. He opined that there was no causal connection between the number of tortfeasors involved and the amount of damages from the decedent's death, and, thus, a damages award premised on the number of tortfeasors would not advance the statute's compensatory and remedial purpose.

Again citing Petro, the hearing justice iterated that joint tortfeasors are "jointly and severally liable" for the $250,000 minimum amount reflected in § 10-7-2. Thus, because plaintiffs settled their claims against Goffe and Petrarca in the amount of $395,000, the hearing justice deemed § 10-7-2 satisfied and concluded that "there is no basis for holding Walmsley individually liable for $250,000." Finally, the hearing justice reasoned that state law clearly provided that the release of one joint tortfeasor reduces the claim against other joint tortfeasors. The hearing justice cited to § 10-6-7 and the Goffe and Petrarca Releases to pronounce that any judgment obtained by plaintiffs against Walmsley "must be reduced by $395,000 (the sum of the joint tortfeasor settlements)." Accordingly, summary judgment was granted in defendant's favor, and plaintiffs timely appealed.

**II**

**Standard of Review**

"This Court reviews a trial justice's decision to grant summary judgment de novo." High Steel Structures, Inc. v. Cardi Corp., 152 A.3d 429, 433 (R.I. 2017) (quoting Boucher v. Sweet, 147 A.3d 71, 73 (R.I. 2016)). "We will affirm a [trial] court's decision only if, after reviewing

- 5 -

the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Id. (quoting Boucher, 147 A.3d at 73).

Statutes and court rules are also reviewed de novo. Raiche v. Scott, 101 A.3d 1244, 1248 (R.I. 2014). "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act * * * ." Id. (quoting State v. Hazard, 68 A.3d 479, 485 (R.I. 2013)). "[W]hen the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Id. (quoting Hazard, 68 A.3d at 485). "However, the plain meaning approach must not be confused with 'myopic literalism'; even when confronted with a clear and unambiguous statutory provision, 'it is entirely proper for us to look to the sense and meaning fairly deducible from the context.'" Id. (quoting Hazard, 68 A.3d at 485). "Therefore, we must 'consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections.'" Id. (quoting Hazard, 68 A.3d at 485).

### III

### Discussion

On appeal, plaintiffs assert a rigid and technical plain-language reading of § 10-7-2, maintaining that the Legislature intended that each tortfeasor be held to a damages amount of no less than $250,000. In support of this assertion, plaintiffs parse through the provision's language and submit that, because the Legislature used the singular form, "he or she or it" rather than "they," it must have intended § 10-7-2's minimum-damages amount to apply to each individual defendant. The plaintiffs aver that the inclusion of the word "shall" further bolsters this requirement that each tortfeasor separately fulfill that amount. The plaintiffs assert that the

hearing justice's reliance on and citation to <u>Petro</u> was misplaced because "[t]he [<u>Petro</u>] court did not undertake strict construction analysis of the language of [chapter 7 of title 10] to arrive at its holding." They argue that the omission of language in § 10-7-2 to signify the joint and several nature of damages indicates that it was not intended to be construed as such. The plaintiffs cite to similar statutes in other states that "contain explicit language" signifying joint and several liability to support their argument that the absence of "explicit language" here suggests no joint and several liability.

Additionally, plaintiffs declare that § 10-7-2 cannot be reconciled with § 10-6-7 because the latter discusses joint and several liability. Citing to G.L. 1956 § 43-3-26 for the principle that when two statutes clash, a "general provision" yields to a "special provision," plaintiffs aver that § 10-6-7, a general provision, should give way to § 10-7-2, a special one. The plaintiffs assert that this Court should not read language into the statute "[a]s the plain language of § 10-7-2 does not provide for such joint and several liability of the minimum recovery * * * ." Finally, plaintiffs allege that the hearing justice erred in referencing the language of the Goffe and Petrarca Releases because they exceeded the scope of § 10-7-2.

We begin our task of statutory interpretation with a keen awareness that our chief goal is to effectuate the purpose underlying the Wrongful Death Act. To this end, this Court has recognized that the Wrongful Death Act's "primary intent [was] the compensation for the loss sustained by widows and children in the eventuality of the death of the family breadwinner." <u>Presley v. Newport Hospital</u>, 117 R.I. 177, 180, 365 A.2d 748, 750 (1976); <u>see</u> <u>also</u> <u>Walsh v. Bressette</u>, 51 R.I. 354, 357, 155 A. 1, 3 (1931) ("The primary purpose of the statute is to provide a remedy for the loss sustained by the death of the person upon whom the beneficiaries were dependent."); <u>Read v. Dunn</u>, 48 R.I. 437, 440, 138 A. 210, 212 (1927) ("The damages are for,

and are measured by, the loss to the estate of the deceased resulting from the death."). In other words, through the wrongful-death statute, the Legislature sought to provide compensatory damages. See Simeone v. Charron, 762 A.2d 442, 446-47 (R.I. 2000).

We note, however, this case's unique posture, which sits at a crossroads between two diverging legal principles. On one hand, we have recognized that the Wrongful Death Act is "in derogation of the common law," which necessitates that we strictly construe its language.[4] Simeone, 762 A.2d at 445; see also Carrigan v. Cole, 35 R.I. 162, 165, 85 A. 934, 935 (1913). On the other hand, "[a]lthough we must give words their plain and ordinary meanings, in so doing we must not construe a 'statute [* * *] in a way that would result in absurdities or would defeat the underlying purpose of the enactment.'" Commercial Union Insurance Co. v. Pelchat, 727 A.2d 676, 681 (R.I. 1999) (quoting Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire, 637 A.2d 1047, 1050 (R.I. 1994)). Indeed, "[i]f a mechanical application of a statutory definition produces an absurd result or defeats legislative intent, this [C]ourt will look beyond mere semantics and give effect to the purpose of the act." Id. (quoting Falstaff Brewing Corp., 637 A.2d at 1050).

---

[4] We briefly pause to reference O'Sullivan v. Rhode Island Hospital, 874 A.2d 179 (R.I. 2005), where this Court suggested, "The wrongful death statute is not, strictly speaking, in 'derogation' of the common law." Id. at 183 n.9 (quoting O'Grady v. Brown, 654 S.W.2d 904, 908 (Mo. 1983)). Nevertheless, whether the statute is in derogation of the common law or not is not ultimately dispositive of this appeal. O'Sullivan does, however, stand for the principle that we should prioritize upholding legislative intent over employing a rigid or technical statutory construction. See id. at 189 n.19 ("[M]any of the decisions in the past * * * have crippled the operation of [wrongful death] legislation by employing a narrow construction on the basis that these statutes are in derogation of the common law. The modern authorities are in agreement that the objectives and spirit of this legislation should not be thwarted by a technical application.") (quoting 3A Sutherland Statutory Construction § 71.05 at 271 (Norman J. Singer 5th ed. 1992)). Even assuming arguendo that this provision operates in derogation of the common law, our task of strict statutory construction must give way to the clear intent of the General Assembly, especially where, as here, construing the statute in the strictest sense would yield an absurd result.

In pertinent part, § 10-7-2 provides:

> "Whenever any person or corporation is found liable under §§ 10-7-1 -- 10-7-4 he or she or it shall be liable in damages in the sum of not less than two hundred fifty thousand dollars ($250,000)."

Here, we decline to indulge in a rigid and technical reading of § 10-7-2. Although we acknowledge that a strict reading of the above language might arguably suggest a minimum-damages amount of $250,000 per defendant because the statute uses singular language when referencing defendants, we deem such an interpretation unreasonable. From a review of the entire statutory scheme in light of common sense, we conclude that the Legislature intended the minimum-damages provision of § 10-7-2 to apply on a per-claim—rather than per-defendant—basis.

We find further support for our statutory construction in the principle that "words importing the singular number may be extended or applied to several persons or things unless such construction would be repugnant to the context of the statute or inconsistent with the manifest intention of the legislature." Van Arsdale, et al., 73 Am. Jur. 2d Statutes § 145 at 381 (2012); see also Public Citizen, Inc. v. Mineta, 340 F.3d 39, 54 (2d Cir. 2003) (applying "the elementary rule of statutory construction that the singular * * * includes the plural"). In fact, § 43-3-4, which concerns "[s]ingular and plural" in constructing and effecting statutes, provides: "Every word importing the singular number only may be construed to extend to and to include the plural number also, and every word importing the plural number only may be construed to extend to and to embrace the singular number also." Because application of this rule would not "lead to a construction inconsistent with the manifest intent of the [G]eneral [A]ssembly, or be repugnant to some other part of the statute"—indeed, quite the opposite—we read § 10-7-2 to apply to multiple actors. Section 43-3-2 (outlining "[a]pplication of rules of construction").

- 9 -

Both the Wrongful Death Act's focus on the act that caused the death (rather than the actors) and the statute's general compensatory purpose reinforce this conclusion. The statute, which prioritizes compensating the deceased's family for its loss, does not differentiate as to how many defendants caused the loss. Whether the decedent's death was caused by one tortfeasor or multiple tortfeasors, the act's remedial goal—and the amount of loss endured by the estate—remains the same. The plaintiffs' proposed statutory interpretation could yield absurd results in that the estate's loss in a wrongful-death case could depend on the number of defendants. That a decedent's death was caused by ten defendants rather than one would produce ten times more damages despite the estate enduring an identical loss. Such a result surely was not intended by the General Assembly.

Finally, we remain cognizant of the "fundamental principle of statutory interpretation that every effort is to be made to harmonize statutes." DelSanto v. Hyundai Motor Finance Co., 882 A.2d 561, 562 n.2 (R.I. 2005). Our construction of § 10-7-2 is in harmony with § 10-6-7, which governs the impact of one tortfeasor's release on other tortfeasors' liability and "reduces the claim against the other tortfeasors in the amount of the consideration paid for the release." The plaintiffs suggest that, because § 10-6-7 references joint and several liability, it flouts § 10-7-2, and therefore the latter provision should take precedence. We disagree. Our reading of § 10-7-2 synchronizes with § 10-6-7 and effectuates the Legislature's intent. The hearing justice properly declined to hold Walmsley individually liable for $250,000 based on the Goffe and Petrarca Releases because the release of a tortfeasor reduces the claim against other joint tortfeasors. We decline to interpret § 10-7-2 to hold Walmsley—a defendant that the jury deemed merely 3 percent at fault—liable for the $250,000 statutory minimum above and beyond the plaintiffs' previously executed settlement releases for $395,000. Rather than separately apply the statutory

- 10 -

minimum to each defendant, § 10-7-2 meshes with § 10-6-7 such that the Wrongful Death Act is subject to joint and several liability principles.

## IV

## Conclusion

Therefore, we affirm the judgment of the Superior Court. The record shall be remanded to that tribunal.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Maureen O'Connell et al. v. William Walmsley. |
| **Case Number** | SU-2016-0058-Appeal.<br>SU-2016-0059-Appeal.<br>(KC 05-161) |
| **Date Opinion Filed** | March 27, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Bennett R. Gallo |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Joanna M. Achille, Esq.<br>Gregory S. Inman, Esq.<br><br>For Defendant:<br><br>David E. Maglio, Esq. |