July 2, 2024

**Supreme Court**

(Dissent begins on Page 50)

| | | |
|---|---|---|
| Joao Neves | : | No. 2022-92-M.P. |
| | | (PM 22-259) |
| v. | : | |
| State of Rhode Island. | : | |
| Keith Nunes | : | No. 2022-93-M.P. |
| | | (PM 22-901) |
| v. | : | |
| State of Rhode Island. | : | |
| Pablo Ortega | : | No. 2022-94-M.P. |
| | | (PM 22-260) |
| v. | : | |
| State of Rhode Island. | : | |
| Mario Monteiro | : | No. 2023-167-M.P. |
| | | (PM 23-921) |
| v. | : | |
| State of Rhode Island. | : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| Joao Neves | : | No. 2022-92-M.P. |
| | | (PM 22-259) |
| v. | : | |
| State of Rhode Island. | : | |
| | | |
| Keith Nunes | : | No. 2022-93-M.P. |
| | | (PM 22-901) |
| v. | : | |
| State of Rhode Island. | : | |
| | | |
| Pablo Ortega | : | No. 2022-94-M.P. |
| | | (PM 22-260) |
| v. | : | |
| State of Rhode Island. | : | |
| | | |
| Mario Monteiro | : | No. 2023-167-M.P. |
| | | (PM 23-921) |
| v. | : | |
| State of Rhode Island. | : | |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

# O P I N I O N

**Justice Goldberg, for the Court.**  The United States Supreme Court has held

that it is unconstitutional to impose upon individuals who were under eighteen years

old at the time of their crimes: sentences of death, life imprisonment without parole

- 1 -

for a nonhomicide offense, or mandatory life imprisonment without parole.[1] In arriving at these decisions, the Supreme Court "relied on three significant gaps between juveniles and adults"; namely, individuals under eighteen years of age possess a "lack of maturity and an underdeveloped sense of responsibility," which often leads "to recklessness, impulsivity, and heedless risk-taking"; younger persons "are more vulnerable * * * to negative influences and outside pressures," including peer pressure, "have limited 'control over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings"; and a juvenile's "character is not as 'well formed' as an adult's[,] his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievable depravity.'" *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (brackets omitted) (quoting *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005)). As explained, "[t]hese salient characteristics mean that 'it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare

---

[1] *See Miller v. Alabama*, 567 U.S. 460, 465 (2012) ("We therefore hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"); *Graham v. Florida*, 560 U.S. 48, 82 (2010) ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.").

juvenile offender whose crime reflects irreparable corruption.'" *Graham v. Florida*, 560 U.S. 48, 68 (2010) (brackets omitted) (quoting *Roper*, 543 U.S. at 573).

Here, we are confronted with a different dynamic as set forth in G.L. 1956 § 13-8-13(e) (Subsection (e) or the amendment), but it embodies many of the same principles discussed in *Miller*, *Graham*, and *Roper*—"the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472. Enacted in 2021, notably as part of the FY 2022 state budget, Subsection (e) states in full:

> "Any person sentenced for *any offense* committed prior to his or her twenty-second birthday, other than a person serving life without parole, shall be eligible for parole review and a parole permit may be issued after the person has served no fewer than twenty (20) years' imprisonment unless the person is entitled to earlier parole eligibility pursuant to any other provisions of law. This subsection shall be given prospective and retroactive effect for all offenses occurring on or after January 1, 1991." (Emphasis added.)

The parties—the State of Rhode Island (petitioner or state) and Joao Neves, Keith Nunes, Pablo Ortega, and Mario Monteiro (collectively, respondents)—offer conflicting interpretations of Subsection (e). The state contends that because Subsection (e) employs the phrase "any *offense*"—in the singular—Subsection (e) is intended to reduce parole eligibility for a single sentence and that qualified offenders serving multiple sentences, such as respondents, are not eligible for a

- 3 -

reduction in parole eligibility pursuant to the amendment's terms. (Emphasis added.) The respondents counter that Subsection (e) applies to "*any* offense," and thus submit that based upon the meaning and breadth of the term "any," the amendment requires aggregating (or combining) multiple sentences for qualified offenders, including consecutive sentences. (Emphasis added.)

For the reasons discussed below, we hold that Subsection (e) mandates the aggregation of a qualified offender's sentences, including consecutive sentences, and the Court further concludes that Subsection (e), as interpreted, does not violate the separation-of-powers doctrine. However, the Court declares that although Subsection (e) applies to respondents, the trial justice erred when he ordered each respondent immediately paroled to the community. We explain herein.[2]

## Facts and Travel

We first consider the aggregation of prison sentences for parole eligibility. For those incarcerated and serving multiple terms, whether or not the sentences are aggregated can mean the difference between serving a sentence in prison and serving a sentence outside the prison walls, such as on parole. In this context, aggregation

---

[2] We express our gratitude for the amici curiae briefs submitted by the Rhode Island Department of Corrections; the Rhode Island Parole Board; the Rhode Island Public Defender; the Roger Williams University School of Law Prisoners' Rights Clinic; the Juvenile Law Center, the Sentencing Project, the Gault Center, the National Association of Criminal Defense Lawyers, and the Prison Policy Initiative; the Campaign for the Fair Sentencing of Youth, Human Rights for Kids, and Aliza Hochman Bloom; and the Center for Law, Brain and Behavior.

means combining the sum total of all pending sentences. To illustrate, an offender receiving three consecutive ten-year terms would be sentenced to imprisonment for thirty years, but in accordance with § 13-8-10(a), the offender is eligible for parole after serving "a term equal to one-third (⅓) of the aggregate time which he or she shall be liable to serve under his or her several sentences," in other words, ten years.

The parties agree that the prerequisites to Subsection (e) are satisfied: Each respondent committed his crimes after January 1, 1991, the crimes were committed before each respondent was twenty-two years old, none of the respondents were sentenced to life imprisonment without parole, and each respondent has served at least twenty years at the Adult Correctional Institutions. They also agree that three respondents (Neves, Ortega, and Nunes) have been sentenced to life imprisonment, and a specified term (a number of years) of incarceration, to be served consecutively to the life sentence; and that Monteiro is serving two consecutive life sentences. The parties disagree whether Subsection (e) requires these sentences to be aggregated, thus resulting in the determination of a single parole eligibility date for each respondent on all sentences; or whether Subsection (e) prohibits aggregation, thus resulting in each respondent receiving a parole eligibility date on the controlling sentence only, i.e., the life sentence. The difference is self-evident: If the sentences are aggregated, each respondent may be paroled to the community; if the sentences are nonaggregated and a respondent is granted parole on the life sentence (whenever

that may occur), he must begin serving the consecutive sentence. Only after becoming eligible for parole on the consecutive sentence—and being granted parole on that sentence—may each respondent be paroled to the community. We note at the outset that based on the dates these crimes were committed, parole eligibility for each life sentence was twenty years. *See* § 13-8-13(a)(3).

## A

### Joao Neves

On February 4, 2000, Neves entered a plea of guilty to first-degree murder and was sentenced to life in prison. In five separate cases, Neves later pled guilty to seven counts of robbery and one count of assault with intent to commit robbery. He received ten-year sentences on the convictions for robbery and assault with intent to commit robbery, with all ten-year sentences to run concurrently with each other, but consecutively to the life sentence. Effectively, Neves was sentenced to life in prison, and a ten-year consecutive sentence. Neves committed all offenses in January 1999, when he was sixteen years old.

Neves appeared before the parole board on August 21, 2019, nearly two years before Subsection (e) was enacted. The parole board minutes set forth a thoughtful analysis and provide, in relevant part:

> "[T]he Board unanimously votes to parole him August 2021 to his next consecutive sentence. * * * The reason for the staggered date is the amount of time the Board believes Mr. Neves should serve on the LIFE sentence.

- 6 -

We will consider him when he is next eligible on his ten year consecutive sentence and we will also schedule a review date in August 2021 to review and assign any special conditions of parole for his Life sentence."

On August 23, 2021, approximately two months after the enactment of Subsection (e), Neves again appeared before the parole board. The parole board minutes indicate, in relevant part:

"This is a Review as requested in Mr. Neves['s] August 2019 parole decision so the Board can check in with him and discuss conditions of parole for his Life Sentence. We commend Mr. Neves for staying positive and on track. We would like to see him participate in programming to address anger management and mindfulness during the next year."

A parole permit issued for Neves in August 2021, which included the special condition that Neves be "Parole[d] to Consecutive Sentence." The Department of Corrections (DOC) subsequently determined that Neves would be eligible for parole from his consecutive sentence and to the community in December 2024.[3]

---

[3] General Laws 1956 § 13-8-9(a) provides as follows:

"The parole board, in the case of any prisoner whose sentence is subject to its control, unless that prisoner is sentenced to imprisonment for life, and unless that prisoner is confined as a habitual criminal under the provisions of § 12-19-21, may, by an affirmative vote of a majority of the members of the board, issue to that prisoner a permit to be at liberty upon parole, whenever that prisoner has served not less than one-third (⅓) of the term for which he or she was sentenced. The permit shall entitle the prisoner to whom it is issued to be at liberty during the

- 7 -

## B

## Keith Nunes

A jury convicted Nunes of first-degree murder, assault with intent to commit murder, three counts of felony assault, carrying a pistol without a license, and a drive-by shooting. Nunes was sentenced to life in prison on the first-degree murder conviction and ten-year concurrent sentences on the remaining counts, to be served consecutively to the life sentence. This Court affirmed the conviction. *See State v. Nunes*, 788 A.2d 460, 465 (R.I. 2002). Effectively, Nunes was sentenced to life in prison, and a ten-year consecutive term. Nunes committed his crimes on June 13, 1999, when he was eighteen years old.

On June 17, 2019, approximately two years before the enactment of Subsection (e), Nunes appeared before the parole board. The parole board minutes state, in relevant part:

> "[T]he Board votes to parole him from this Life Sentence to his next Consecutive Sentence of ten years. We will see him when he is next eligible on that sentence. * * * Conditions of parole on this Life Sentence will include mental health and substance abuse treatment assessments and counseling as needed for the duration of parole. The Board will set more specific conditions when we see him when he is next eligible. Parole is contingent upon this offender remaining booking free and in any program or educational course in which he is currently enrolled."

---

remainder of his or her term of sentence upon any terms and conditions that the board may prescribe."

- 8 -

The parole board further indicated that Nunes "will be reviewed in November 2022 to determine conditions of parole on the Life Sentence."[4] A parole permit issued for Nunes in September 2019, which included the special condition that Nunes be "Parole[d] to his consecutive sentence." The DOC subsequently determined that Nunes would be eligible for parole from his consecutive sentence and to the community in November 2022.

## C

## Pablo Ortega

On March 20, 2002, Ortega entered a guilty plea to first-degree murder and conspiracy to commit a felony. Ortega was sentenced to life in prison on the first-degree murder conviction and five years on the conspiracy conviction, consecutive to the life imprisonment sentence. Ortega committed his crimes in November 2001, when he was nineteen years old.

On November 8, 2021, after the enactment of Subsection (e), Ortega appeared before the parole board. This is the first parole hearing in which the provisions of Subsection (e) are addressed. The parole board minutes evince, in relevant part:

> "We find that Mr. Ortega has achieved a level of rehabilitation and served sufficient time to meet statutory parole release from this Life sentence. We acknowledge that he has a consecutive sentence of five years and that

---

[4] As discussed, *infra*, Nunes did not appear before the parole board on that date because the trial justice had already ordered that Nunes be released to the community.

- 9 -

there is an existing legal debate in court on the application of this term whether it is aggregated and parole is to the community or whether he must serve his consecutive sentence imposed by the court. * * * For our part, the Board votes unanimously [to] parole Mr. Ortega from his Life sentence to the community or to his next sentence, the same to be determined by the Department of Corrections."

A subsequent parole board entry indicates that Ortega was paroled from his life sentence to the five-year consecutive sentence. A parole permit issued for Ortega in December 2021, which included the special condition that he was paroled "[t]o the community or to his next sentence, the same to be determined by the Department of Corrections." Ortega would be eligible for parole from his consecutive sentence and to the community in or around July 2023.

## D

### Mario Monteiro

On May 3, 2002, a jury convicted Monteiro of first-degree murder, conspiracy to commit murder, discharging a firearm while committing a crime of violence resulting in death, numerous counts of felony assault, and various other related charges. We affirmed the conviction. *See State v. Monteiro*, 924 A.2d 784, 796 (R.I. 2007). As relevant, Monteiro was sentenced to two consecutive terms of life imprisonment. Monteiro committed his offenses in July 2001, when he was seventeen years old.

On October 19, 2022, after the enactment of Subsection (e), Monteiro appeared before the parole board. The parole board minutes state, in relevant part:

> "Mr. Monteiro is serving two mandatory consecutive LIFE sentences for Murder and the Use of a Firearm During a Violence Crime. He has been serving since November 29, 2001. * * * We understand that he has a mandatory consecutive life sentence and that there is an existing legal debate in court on the application of this consecutive term – whether it is aggregated and consumed by the first life sentence eligibility or whether he has yet to and must serve this next term. * * * For our part, the Board votes unanimously to parole Mr. Monteiro from his first life sentence. If it is determined that he must serve another consecutive life term, then the effective parole release date shall be the date of this decision (December 15, 2021). If it is determined that he is eligible for immediate release to the community, then the effective parole release date shall be no sooner than December 2022. The reason for the staggered release (if to the community) is the Board believes there should be some time for Mr. Monteiro to transition to a lower security and preparation for eventual release."

A subsequent DOC entry indicates that Monteiro was paroled to the consecutive sentence and is not eligible for parole from his consecutive sentence until January 2037.

### E

### The Postconviction-Relief Proceedings

On January 14, 2022, Neves and Ortega filed applications for postconviction relief in the Superior Court; on February 15, 2022, Nunes filed an application for postconviction relief; and on February 24, 2023, Monteiro followed. The

- 11 -

applications filed by Neves, Ortega, and Nunes were treated as consolidated and the consolidated applications, as well as the application filed by Monteiro, were assigned to a single justice of the Superior Court.

General Laws 1956 chapter 9.1 of title 10 governs the statutory remedy for postconviction relief. The state and respondents[5] filed cross-motions for summary disposition or summary judgment pursuant to § 10-9.1-6(c) and/or Rule 56 of the Superior Court Rules of Civil Procedure, respectively.[6] On March 31, 2022, the trial

---

[5] Neves, Ortega, Nunes, and Monteiro were the petitioners in the Superior Court but are the respondents in the Supreme Court. To avoid confusion, we continue to reference Neves, Ortega, Nunes, and Monteiro as respondents despite their status in the Superior Court proceedings.

[6] General Laws 1956 § 10-9.1-6(c) states:

> "The court may grant a motion by either party for summary disposition of the application when it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."

This Court has observed that "summary dismissal under § 10-9.1-6(c) 'closely resembles' a grant of summary judgment under Rule 56 of the Superior Court Rules of Civil Procedure" and that "the standards for granting a § 10-9.1-6(c) summary dismissal are identical to those utilized in passing on a summary judgment motion." *See Reyes v. State*, 141 A.3d 644, 652 (R.I. 2016) (brackets omitted) (quoting *Palmigiano v. State*, 120 R.I. 402, 405, 406, 387 A.2d 1382, 1384, 1385 (1978)).

justice heard oral arguments in the Neves/Ortega/Nunes consolidated applications for postconviction relief and issued a bench decision, granting respondents' motion for summary disposition or summary judgment and denying the state's cross-motion for summary judgment. In so doing, the trial justice rejected what he characterized as the state's "disaggregation method" to calculate parole eligibility and concluded that "as of July 6, 2021, each [respondent] was entitled to be paroled to the community as they each had served 20 years and they were each 22 years or younger at the time of the commission of their crimes." The trial justice added that:

> "Based upon the unanimous decisions of the [p]arole [b]oard that each [respondent] satisfied the criteria for parole, Neves and Nunes should have been issued a parole permit to the community on or shortly after July 6, 2021 and Ortega should have been issued a parole permit to the community when the [p]arole [b]oard issued its permit on December 10, 2021.
>
> "* * *
>
> "The terms of [Subsection (e)] entitles each [respondent] to immediate release. Therefore, the [c]ourt orders that each [respondent] shall be immediately released from incarceration at the Adult Correctional Institutions to parole, to be at liberty in the community, upon such terms and conditions as previously or hereinafter set by the [p]arole [b]oard."

Subsequently, an order issued that Neves be "immediately released from incarceration to be at liberty on parole upon the terms and conditions set by the [p]arole [b]oard by unanimous vote on August 21, 2021"; that Ortega be

"immediately released from incarceration to be at liberty on parole upon the terms and conditions set by the [p]arole [b]oard by unanimous vote on November 8, 2021"; and that Nunes be "immediately brought before the [p]arole [b]oard to determine the terms and conditions for his release from incarceration to be at liberty on parole and to be thereafter released from incarceration to be at liberty on parole in accordance with such terms and conditions." On March 31, 2022, judgment entered on the Neves/Ortega/Nunes consolidated cases.

On May 17, 2023, the trial justice issued a written decision, granting Monteiro's motion for summary disposition and denying the state's cross-motion for summary disposition. In so doing, the trial justice concluded that Subsection (e) applied to respondent and he further rejected the state's argument that, as interpreted, Subsection (e) modifies a judicial sentence and therefore represented an impermissible encroachment by the General Assembly into powers constitutionally reserved to the judicial branch of government. A subsequent order issued that Monteiro be "immediately brought before the [p]arole [b]oard to confirm the terms and conditions for his release from incarceration to be at liberty on parole set in December 2021 with review after December 2022 and to be thereafter released from incarceration to be at liberty on parole in accordance with such terms and conditions." Judgment entered on May 22, 2023.

- 14 -

# F

## The Supreme Court Proceedings

On April 4, 2022, the state filed three separate petitions for a writ of certiorari, seeking review of the judgments entered with respect to Neves, Ortega, and Nunes. Thereafter, on April 7, 2022, the state filed an emergency motion seeking a stay of the trial justice's decision and order that each respondent (Neves, Ortega, and Nunes) be immediately released on parole. A single justice of this Court granted the emergency stay, pending consideration by the full Court. Upon consideration, this Court ordered that the Neves and Nunes cases "shall be remanded to the Superior Court for the sole purpose of the Superior Court setting bail on the consecutive sentence to which respondent was paroled by the [p]arole [b]oard." This Court also denied the emergency motion to stay with respect to Ortega. It is our understanding that upon his release from the ACI, Ortega was taken into federal custody on an immigration detainer and ultimately deported. In due course, we granted the state's petitions for a writ of certiorari to review the trial justice's judgments with respect to Neves, Ortega, and Nunes.[7]

---

[7] Because Ortega has been deported, is no longer in the United States, his return to the United States is, at best, speculative, and he is no longer under the control of the parole board, we conclude that review of the trial justice's judgment granting Ortega's postconviction-relief application is moot. *See Boyer v. Bedrosian*, 57 A.3d 259, 272 (R.I. 2012) ("A case is moot if there is no continuing stake in the controversy, or if the court's judgment would fail to have any practical effect on the

On May 23, 2023, the state filed a petition for a writ of certiorari, seeking review of the judgment entered with respect to Monteiro. Thereafter, on May 26, 2023, the state filed an emergency motion seeking a stay of the trial justice's decision and order that Monteiro be released on parole. A single justice of this Court granted the emergency stay, pending consideration by the full Court. Upon consideration, this Court granted the emergency motion to stay the decision and order. Monteiro remains incarcerated at the ACI. In due course, we granted the state's petition for a writ of certiorari and ordered all matters consolidated.

## Standard of Review

"The postconviction remedy, set forth in § 10-9.1-1, provides that 'one who has been convicted of a crime may seek collateral review of that conviction based on alleged violations of his or her constitutional rights.'" *Brown v. State*, 32 A.3d 901, 907 (R.I. 2011) (quoting *Lynch v. State*, 13 A.3d 603, 605 (R.I. 2011)). The applicant carries "'the burden of proving, by a preponderance of the evidence, that such relief is warranted' * * *." *Id.* (brackets omitted) (quoting *State v. Laurence*, 18 A.3d 512, 521 (R.I. 2011)). This Court reviews "*de novo* any post-conviction relief decision involving questions of fact or mixed questions of law and fact

controversy."). Consequently, further reference to Ortega within this opinion is unnecessary.

- 16 -

pertaining to an alleged violation of an applicant's constitutional rights." *Id.* at 908 (quoting *Cote v. State*, 994 A.2d 59, 63 (R.I. 2010)).

In this respect, "[t]he construction of legislative enactments is a matter reserved for the courts and, as final arbitrator on questions of construction, it is this [C]ourt's responsibility in interpreting a legislative enactment to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." *State v. Badessa*, 869 A.2d 61, 65 (R.I. 2005) (deletion omitted) (quoting *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I. 1987)). "This Court reviews questions of statutory interpretation *de novo*." *Rose v. State*, 92 A.3d 903, 906 (R.I. 2014) (brackets omitted) (quoting *McCulloch v. McCulloch*, 69 A.3d 810, 819 (R.I. 2013)).

"When the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Rose*, 92 A.3d at 906 (brackets omitted) (quoting *State v. Hazard*, 68 A.3d 479, 485 (R.I. 2013)). As we have stated on innumerable occasions, "it is generally presumed that the General Assembly intended every word of a statute to have a useful purpose and to have some force and effect." *State v. Briggs*, 58 A.3d 164, 168 (R.I. 2013) (brackets omitted) (quoting *Curtis v. State*, 996 A.2d 601, 604 (R.I. 2010)). Thus, we "consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme,

- 17 -

not as if each section were independent of all other sections." *Id.* (quoting *Mendes v. Factor*, 41 A.3d 994, 1002 (R.I. 2012)). Finally, "under no circumstances will this Court construe a statute to reach an absurd result." *State v. Morrice*, 58 A.3d 156, 160 (R.I. 2013) (quoting *Mendes*, 41 A.3d at 1002).

## Discussion

## A

## Parole Eligibility

It is well settled that "there is no constitutional or inherent right to parole * * *." *Bishop v. State*, 667 A.2d 275, 278 (R.I. 1995) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). Instead, parole accrues to an offender "through legislative grace and can be withheld or withdrawn by the legislature at will." *State v. Fazzano*, 96 R.I. 472, 478, 194 A.2d 680, 684 (1963).

In Rhode Island, parole is governed by chapter 8 of title 13, and within that chapter the General Assembly "has provided a statutory scheme that creates a parole board and generally empowers the parole board to grant parole to any prisoner within its control upon completion of a specified portion of the sentence imposed." *Skawinski v. State*, 538 A.2d 1006, 1007 (R.I. 1988). In determining whether the parole eligibility calculation under Subsection (e) requires aggregation of sentences, we focus on three provisions.

- 18 -

For offenders serving a single sentence, except a sentence of life imprisonment or a habitual-criminal sentence pursuant to G.L. 1956 § 12-19-21, the parole board may "issue to that prisoner a permit to be at liberty upon parole, whenever that prisoner has served not less than one-third (⅓) of the term for which he or she was sentenced." Section 13-8-9(a).[8]  Because § 13-8-9 applies only to offenders serving single sentences, aggregation has no application.

For offenders serving more than one sentence, parole eligibility is generally calculated through § 13-8-10(a).  This provision expressly mandates the method of calculation when multiple sentences are imposed, either concurrently or consecutively:

> "If a prisoner is confined upon more than one sentence, a parole permit may be issued whenever he or she has served a term equal to one-third (⅓) of the *aggregate time* which he or she shall be liable to serve under his or her *several sentences*, unless he or she has been sentenced to serve two (2) or more terms concurrently, in which case the permit shall be issued when he or she has served a term equal to one-third (⅓) of the maximum term he or she is required to serve." (Emphases added.)

This Court has observed that under § 13-8-10, "[a] prisoner serving consecutive sentences is eligible for parole after serving a term equal to *one-third of the total*

---

[8] Notwithstanding this provision, "in the case of a conviction for a first- or second-degree murder committed after July 1, 2015, when the prisoner has not been sentenced to life, the prisoner shall not be eligible for a parole permit until he or she has served at least fifty-percent (50%) of his or her sentence." Section 13-8-9(b).

*amount of the sentences,*" that is, the sentences are aggregated. *See Lerner v. Gill*, 463 A.2d 1352, 1364 (R.I. 1983). We also expressed that "[i]t is clear that §§ 13-8-9 and -10 address themselves to prisoners serving a sentence or sentences the length of which was known at the time of imposition. * * * [I]t is obvious that the concurrent and consecutive provisos of § 13-8-10 refer to those sentences whose terms are definite." *Id.* at 1365; *see also DeCiantis v. State*, 666 A.2d 410, 412 (R.I. 1995) ("The applicant seeks to invoke § 13-8-10, entitled 'Prisoners subject to more than one sentence.' The applicant in fact is subject to more than one sentence. But because the sentences he must serve are life sentences, his parole eligibility is governed by § 13-8-13, entitled 'Life prisoners and prisoners with lengthy sentences.'").

Lastly, for offenders serving an indeterminate sentence of life imprisonment, or offenders serving sentences in which the offender is ineligible for a permit in less than ten years pursuant to §§ 13-8-9 and 13-8-10, parole eligibility is calculated in accordance with § 13-8-13, entitled "Life prisoners and prisoners with lengthy sentences." That provision provides, in relevant part:

> "(a) In the case of a prisoner sentenced to imprisonment for life, a parole permit may be issued at any time after the prisoner has served not less than ten (10) years' imprisonment; provided that:
>
> "(1) In the case of a prisoner serving a sentence or sentences of a length making him or her ineligible for a permit in less than ten (10) years, pursuant to §§ 13-8-9

and 13-8-10, the permit may be issued at any time after the prisoner has served not less than ten (10) years' imprisonment;

"* * *

"(3) In the case of a prisoner sentenced to imprisonment for life for a first- or second-degree murder committed after June 30, 1995, the permit may be issued only after the prisoner has served not less than twenty (20) years' imprisonment;

"* * *

"(d) * * * [I]n the case of a prisoner sentenced consecutively to more than one life term for crimes occurring after June 30, 1995, the permit may be issued only after the prisoner has served not less than fifteen (15) years consecutively on each life sentence." Section 13-8-13(a)(1), (a)(3), (d).

In stark contrast to these amendments, which radically extended the time for parole eligibility, Subsection (e) falls directly below § 13-8-13(d) and amalgamates definite and indeterminate sentences and reduces the time for parole eligibility.

In *DeCiantis*, we considered the parole eligibility of an offender sentenced to serve two concurrent life sentences, as well as "another life sentence to be served consecutively to the concurrent sentences." *DeCiantis*, 666 A.2d at 411. When DeCiantis was convicted, a prisoner was eligible for parole on a life sentence after ten years. *Id.* at 412-13. On postconviction relief, DeCiantis sought to invoke § 13-8-10; and we held that because the sentences were indeterminate life sentences,

- 21 -

what was then codified as § 13-8-13(b) controlled.[9] *Id.* In so doing, this Court aggregated the sentences and expressed that then-§ 13-8-13(b) "require[d] that applicant serve [a single term of ten years on] the concurrent life sentences and an additional ten years on the consecutive life sentence *before becoming eligible for consideration for parole.*" *Id.* at 412 (emphasis added); *see also id.* at 413 (observing that "a prisoner who is serving only one life sentence consecutively to another life sentence must serve twenty years before even seeking parole"); *In re Advisory Opinion to the Governor*, 421 A.2d 535, 536 (R.I. 1980) ("[A]n individual who has been sentenced to serve two or more consecutive life sentences must serve ten years on each sentence before seeking parole.").[10]

---

[9] This provision is currently codified as § 13-8-13(d).

[10] Since its enactment in 1915, § 13-8-13 has been the subject of numerous amendments. At the time DeCiantis was sentenced, § 13-8-13 consistently provided that "a prisoner sentenced to imprisonment for life" was eligible for parole after serving not less than ten years imprisonment; "a prisoner serving a sentence or sentences of a length making him ineligible for a permit in less than ten (10) years pursuant to 13-8-9 and 13-8-10" was eligible for parole after serving not less than ten years imprisonment; and "a prisoner sentenced consecutively to more than one life term, for crimes occurring after the effective date of this statute," was eligible for parole after serving "not less than ten (10) years consecutively on each life sentence * * *." Section 13-8-13, as enacted by P.L. 1981, ch. 36, § 1. Over time, parole eligibility has continued to evolve. Currently, "[i]n the case of a prisoner sentenced to imprisonment for life for a first- or second-degree murder committed after July 10, 1989, the permit may be issued only after the prisoner has served not less than fifteen (15) years' imprisonment"; "[i]n the case of a prisoner sentenced to imprisonment for life for a first- or second-degree murder committed after June 30, 1995, the permit may be issued only after the prisoner has served not less than twenty (20) years' imprisonment"; and "[i]n the case of a prisoner sentenced to

- 22 -

The focus of the parole statute scheme and this Court's opinion is parole eligibility, not attainment of a parole permit. This Court has never held that a prisoner must be granted parole on one sentence to then begin serving the next consecutive sentence.

Our conclusion that the structure and statutory framework governing parole mandates aggregating an offender's multiple definite and indeterminate sentences in order to calculate parole eligibility, including consecutive sentences, accords with the practice of the DOC in certain respects. In its amicus brief, the DOC avers that "[a]ny prisoner who is sentenced to multiple sentences, is eligible for consideration of parole after serving one-third (1/3) of the aggregate time which he or she shall be required to serve under his or her sentence." (Citing § 13-8-10(a).) The DOC also represents that "[w]hen ascertaining the initial parole eligibility date on multiple life sentences, the Department aggregates the term of years using the mandatory minimums provided in § 13-8-13," except that the DOC has interpreted Subsection (e) "as prohibiting [aggregating] * * * multiple consecutive life sentences, specifically where the minimum mandatory term(s) of imprisonment pursuant to § 13-8-13 were greater than twenty (20) years." Despite generally aggregating an offender's multiple definite and indeterminate sentences, the DOC

imprisonment for life for a first- or second-degree murder committed after July 1, 2015, the permit may be issued only after the prisoner has served not less than twenty-five (25) years' imprisonment[.]" *See* § 13-8-13(a)(2)-(a)(4).

- 23 -

acknowledges that "a distinction [is made] that a life sentence with a consecutive term of years sentence, is not aggregated when calculating parole eligibility dates."[11] That is the crux of this case. We see no statutory authority for this *ad hoc* policy in general and particularly with respect to Subsection (e). This policy conflates parole eligibility with the actual attainment of parole. In the context of Subsection (e), we conclude that this distinction, which has the antithetical result of prolonging parole eligibility for qualified offenders, is unwarranted. When the parole board grants parole, the "inmate should be released from confinement," subject to the parole board's conditions. *See Dinkins v. Massachusetts Parole Board*, 160 N.E.3d 613, 620 (Mass. 2021); *see also* § 13-8-14(a)(3), (a)(4) (requiring parole board to consider, *inter alia*, the "reasonable probability that the prisoner, if released, would live and remain at liberty without violating the law" and the prisoner's "role in the city or town in which he or she is to reside"); *Dinkins*, 160 N.E.3d at 623 ("'[R]equiring the board to make a series of decisions granting parole from one sentence to the next rather than a single decision on the basis of one parole eligibility date for all sentences' would 'make little sense since the decision to grant parole is to be based on whether the board believes the prisoner can live freely outside of

---

[11] We are advised that, prior to 2018, the DOC practice was to determine parole eligibility by aggregating a life sentence with a consecutive sentence. The DOC unilaterally changed this practice in the absence of statutory authority. *See, e.g.*, *Lerner v. Gill*, 463 A.2d 1352, 1365 (R.I. 1983).

prison without violating the law.'") (brackets omitted) (quoting *Henschel v. Commissioner of Correction*, 330 N.E.2d 480, 484 (Mass. 1975)). We turn our attention to this amendment.

**B**

**Statutory Construction**

Subsection (e) states:

> "Any person sentenced for *any offense* committed prior to his or her twenty-second birthday, other than a person serving life without parole, shall be eligible for parole review and a parole permit may be issued after the person has served no fewer than twenty (20) years' imprisonment unless the person is entitled to earlier parole eligibility pursuant to any other provisions of law. This subsection shall be given prospective and retroactive effect for all offenses occurring on or after January 1, 1991." (Emphasis added.)

This amendment is not a model of clarity because, although its clear intent is to reduce the period of incarceration for qualified offenders, it fails to address consecutive sentences.[12]

The state submits that because Subsection (e) employs the phrase "any *offense*"—in the singular—the amendment applies only to qualified offenders serving a single sentence, not offenders serving multiple sentences, such as respondents. (Emphasis added.) Under the state's interpretation, when a qualified

---

[12] There are additional infirmities in Subsection (e), which are not before us. *See infra*.

- 25 -

offender must serve more than twenty years' incarceration on a single sentence before becoming eligible for parole, Subsection (e) operates to reduce the eligibility to twenty years' incarceration. The state's argument continues that if a qualified offender is granted parole on the single sentence, he or she would be paroled to the *next* consecutive sentence and required to serve the statutory minimum sentence on the consecutive sentence before the parole eligibility process would begin anew.

The respondents counter that Subsection (e) applies to "*any* offense," and they focus on the breadth of the word "any." (Emphasis added.) Based on the usage and plain meaning of the term "any," respondents contend that when determining parole eligibility, Subsection (e) contemplates aggregating multiple sentences, including consecutive sentences. Since aggregation of each respondent's sentences would result in a parole eligibility date exceeding twenty years, respondents posit that the amendment provides for parole eligibility at no fewer than twenty years' incarceration, which they have served. Under this interpretation, a qualified offender could be granted parole on all pending sentences, including consecutive sentences, and would be paroled to the community. We agree with respondents and set forth our reasoning.

First, although the narrow issue before this Court concerns the interpretation of Subsection (e), "we must consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each

section were independent of all other sections." *Briggs*, 58 A.3d at 168 (quoting *Mendes*, 41 A.3d at 1002). In so doing, we have determined that the statutory scheme pertaining to the calculation of parole eligibility for offenders serving multiple definite or indeterminate sentences, including consecutive sentences, requires aggregation. *See supra.* Recognizing that because the statutory scheme generally requires that offenders serving multiple definite sentences *or* multiple indeterminate sentences must have their terms aggregated for parole eligibility purposes, it would be inconsistent with the General Assembly's overall intent and the structure of the parole statutes to conclude that chapter 8 prohibits aggregating an offender's sentences for parole eligibility purposes when those sentences contain both definite *and* indeterminate terms.

In construing the overall statutory scheme, we also note that in 2021, also as part of the FY 2022 state budget, the General Assembly mandated that when a person "serving a sentence imposed as the result of an offense or offenses committed when he or she was less than eighteen years of age becomes eligible for parole," the parole board must "provide[] a meaningful opportunity to obtain release" and must consider "the diminished culpability of juveniles as compared to that of adults and any subsequent growth and increased maturity of the prisoner during incarceration." Section 13-8-14.2. The General Assembly's efforts resulting in the simultaneous enactment of § 13-8-14.2 and Subsection (e) must be read in tandem and evince an

overall intent to afford juvenile offenders a meaningful opportunity for parole to the community, if deemed appropriate by the parole board.

Second, we are mindful of the breadth of the language utilized by the General Assembly; most notably, the word "any" appears twice within the first six words. *See* § 13-8-13(e). Consistent with its plain language and meaning, this Court has interpreted "any" in its broadest sense.

In *State v. Mann*, 119 R.I. 720, 382 A.2d 1319 (1978), the defendant, a certified osteopath, claimed he was exempt from the Uniform Controlled Substances Act, which, unless lawfully obtained, prohibited "any person knowingly or intentionally to possess a controlled substance * * *." *Mann*, 119 R.I. at 721-22, 382 A.2d at 1320 (quoting G.L. 1956 § 21-28-4.01(C)). We rejected the defendant's argument that as a certified osteopath, he was exempt from the prohibition, explaining: "The language is clear. It is well settled that, in the absence of ambiguity, words used in a statute must be given their plain and ordinary meaning unless a contrary intention appears on the face of the statute." *Id.* at 724, 382 A.2d at 1321. Accordingly, we concluded that "'any person' * * * includes physicians." *Id.* (quoting § 21-28-4.01(C)(1)).

In *State v. Caprio*, 477 A.2d 67 (R.I. 1984), we employed a similar plain-meaning analysis. The defendant was convicted of committing first-degree arson, a crime that provided, in relevant part, that "[a]ny person who knowingly

causes, procures, aids, counsels or creates by means of fire or explosion, *a substantial risk of serious physical harm to any person* * * * shall, upon conviction, be sentenced to imprisonment for not less than five (5) years * * *." *Caprio*, 477 A.2d at 69 (emphasis added) (quoting G.L. 1956 § 11-4-2).

On appeal, Caprio argued that despite the scope and meaning of "any," the phrase "substantial risk of serious physical harm to *any* person" should not be interpreted to include responding firefighters because doing so would transform any arson crime into "first degree merely by the arrival of members of the fire department." *Caprio*, 477 A.2d at 70 (emphasis added) (footnote omitted). This Court rejected the defendant's argument and adhered to the plain language, recognizing that "the very breadth of the term 'any person' defies the exclusion of any class of persons. That term is so broad as to require exclusion, not specific inclusion." *Id.* at 71.

The state does not dispute the breadth of the phrase "any offense," but rather suggests that it "simply means that an individual convicted of any criminal offense identified in the General Laws before he or she turned twenty-two is eligible to see the parole board after serving twenty years."[13] While plausible, the state's argument

---

[13] We interpret the state's argument to mean "any offense," except in which "a person [is] serving life without parole," as stated in Subsection (e). *See* § 13-8-13(e).

- 29 -

misses the mark that when it enacted Subsection (e), the General Assembly effectuated its intent through the broadest possible language.

Third, we address the state's main interpretative argument, that the inclusion of the word "offense"—in the singular—demonstrates that "the General Assembly intended [S]ubsection (e) to apply to individuals serving a single sentence and not to individuals such as [respondents] who are serving consecutive sentences." While the state attributes great importance to the singular usage of the term "offense," we conclude that this emphasis is misplaced.[14]

General Laws 1956 § 43-3-4 contemplates the state's argument and addresses the General Assembly's usage of singular and plural words. In such circumstances, § 43-3-4 provides the following rule of construction: "Every word importing the singular number only may be construed to extend to and to include the plural number also, and every word importing the plural number only may be construed to extend to and to embrace the singular number also." In other words, § 43-3-4 directs that a singular word may be interpreted as plural, and a plural word may be interpreted as singular.

---

[14] As will be discussed *infra*, individuals imprisoned on a single offense are few in number and, additionally, anyone convicted of a crime involving a firearm faces additional mandatory consecutive imprisonment. *See* Weapons, G.L. 1956 chapter 47 of title 11.

- 30 -

In *Pierce v. Providence Retirement Board*, 15 A.3d 957 (R.I. 2011), a Providence firefighter applied for accidental disability retirement, which required the applicant to demonstrate, *inter alia*, that the incapacity was "a natural and proximate result of *an accident* while in the performance of duty * * *." *Pierce*, 15 A.3d at 962 (emphasis and internal quotation marks omitted). After receiving several medical opinions that concluded Pierce's injury was not the result of "an accident," but instead the result of multiple accidents, the Providence Retirement Board rejected Pierce's accidental disability retirement claim. *Id.*

This Court examined Providence Code § 1-2, the city's version of § 43-3-4. *See Pierce*, 15 A.3d at 966. Similar to the state analogue, the city code provided that "a word importing the singular number only may extend and be applied to several persons and things as well as to one person and thing." *Id.* (brackets omitted). Applying this rule of construction, this Court concluded that "an accident must be read to include multiple accidents." *Id.* (internal quotation marks omitted).

Likewise, in *O'Connell v. Walmsley*, 156 A.3d 422 (R.I. 2017), the plaintiffs argued that because the Wrongful Death Act "used the singular form, 'he or she or it' rather than 'they,' [the General Assembly] must have intended § 10-7-2's minimum-damages amount to apply to each individual defendant." *O'Connell*, 156 A.3d at 426. As such, the plaintiffs maintained that they were entitled to recover the $250,000 statutory minimum from each named defendant. *Id.* We acknowledged

- 31 -

that "a strict reading of the above language might arguably suggest a minimum-damages amount of $250,000 per defendant because the statute uses singular language when referencing defendants," but nonetheless concluded that "such an interpretation [was] unreasonable." *Id.* at 428. In so doing, we expressed that "[b]ecause application of [§ 43-3-4] would not 'lead to a construction inconsistent with the manifest intent of the General Assembly, or be repugnant to some other part of the statute' * * * we read § 10-7-2 to apply to multiple actors." *Id.* (brackets omitted) (quoting § 43-3-2). Thus, despite the statutory reference in the singular, we held that the $250,000 minimum damage award applied to all the defendants, jointly and severally. *Id.* at 429; *see also State v. Ros*, 973 A.2d 1148, 1165 (R.I. 2009) ("If we were to adhere to defendants' logic, and hold that use of singular pronouns in a criminal statute prevented the application of vicarious liability, there could hardly be vicarious liability for any crime."); *Brogno v. W & J Associates, LTD*, 698 A.2d 191, 193 (R.I. 1997) ("[E]ven though § 28-29-6.1 uses the term 'subcontractor,' we can, in a manner consistent with § 43-3-4, construe that term to mean 'subcontractors.'").

Consistent with § 43-3-4 and our precedent, we conclude that "any offense" may be interpreted to include any offenses, provided such an interpretation does not lead to a construction "inconsistent with the manifest intention of the legislature," or is otherwise repugnant to some other portion of the statute. *See O'Connell*, 156 A.3d

- 32 -

at 428 (quoting Van Arsdale, et al., 73 Am. Jur. 2d *Statutes* § 145 at 381 (2012)). As noted, *supra*, interpreting Subsection (e) to require the aggregation of respondents' offenses, whether definite or indeterminate sentences, is consistent with the overall framework of chapter 8, the General Assembly's ameliorative efforts in 2021, and the breadth of language employed in Subsection (e).

Fourth, in light of the state's contention that Subsection (e) applies to a single offense and reduces parole eligibility for only that single offense to twenty years' imprisonment, the state was asked during oral argument to identify any crime to which this argument would apply and that would require an offender to serve more than twenty years in prison before becoming eligible for parole. The state offered only one offense, which we set forth in the following: "In the case of a prisoner sentenced to imprisonment for life for a first- or second-degree murder committed after July 1, 2015, the permit may be issued only after the prisoner has served not less than twenty-five (25) years' imprisonment * * *." Section 13-8-13(a)(4). In our opinion, this response conclusively demonstrates the General Assembly's intention that Subsection (e) mandates aggregating an offender's multiple definite and indeterminate sentences to determine parole eligibility.

It is axiomatic that the General Assembly "is presumed to have intended each word or provision of a statute to express a significant meaning, and the Court will give effect to every word, clause, or sentence, whenever possible." *In re B.H.*, 194

A.3d 260, 264 (R.I. 2018) (brackets omitted) (quoting *State v. Clark*, 974 A.2d 558, 571 (R.I. 2009)). We have also expressed that "this Court will not construe a statute to reach an absurd result." *Id.* (brackets omitted) (quoting *Long v. Dell, Inc.*, 984 A.2d 1074, 1081 (R.I. 2009)). The state's analysis contravenes these canons.

Under the state's reasoning, the General Assembly's entire—and sole—purpose for enacting Subsection (e) was to reduce the parole eligibility for a qualified offender who committed a first- or second-degree murder after *July 1, 2015.* Seemingly, such a narrow construction conflicts with the state's prior argument that Subsection (e) was intended to apply to "any offense" and requires this Court to conclude that, despite Subsection (e)'s remedial nature, *see infra*, the General Assembly intended to benefit only qualified offenders who committed first- or second-degree murder after July 1, 2015, and intended to bestow no benefit on other otherwise qualified offenders who committed any offense(s) (including first- or second-degree murder) on or before July 1, 2015. Such a conclusion is inconsistent with the plain language of Subsection (e), which provides that "[t]his subsection shall be given prospective and retroactive effect for all offenses *occurring on or after January 1, 1991.*" Section 13-8-13(e) (emphasis added).

The state's construction also requires this Court to determine that, despite the legislative efforts undertaken in 2021, resulting in the enactment of Subsection (e), the General Assembly had no intention to actually benefit *any* qualified offender

- 34 -

until at least the year 2035 for this specific crime committed after July 1, 2015.[15] The state's hypothesis effectively renders Subsection (e) meaningless for another decade and conflicts with longstanding canons that the General Assembly "is presumed to have intended each word or provision of a statute to express a significant meaning," *Clark*, 974 A.2d at 571 (quoting *State v. Bryant*, 670 A.2d 776, 779 (R.I. 1996)), and that "no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage," *id.* at 572 (quoting *State v. DeMagistris*, 714 A.2d 567, 573 (R.I. 1998)).

Finally, we recognize that this amendment is remedial in nature. *See Esposito v. O'Hair*, 886 A.2d 1197, 1203 (R.I. 2005) ("In the parlance of statutory construction, a remedial statute is 'one which affords a remedy, or improves or facilitates remedies already existing for the enforcement [of] rights [or] redress of wrongs * * *.'") (quoting *Ayers-Schaffner v. Solomon*, 461 A.2d 396, 399 (R.I. 1983)). Although the parties disagree on the scope of the remedial relief provided by Subsection (e), the parties do agree—and we so conclude—that the plain language and meaning of Subsection (e) affords, improves, or facilitates already existing rights or redress for qualified offenders, namely, an earlier parole eligibility date. *See State v. Vera*, 334 P.3d 754, 759 (Ariz. Ct. App. 2014) ("Section 13-716

---

[15] At that point, nearly fifteen years after its enactment, Subsection (e) would reduce parole eligibility for a qualified offender from twenty-five years, with an eligibility date in 2040, to twenty years, with an eligibility date in 2035.

affects only the implementation of Vera's sentence by establishing his eligibility for parole after he has served the minimum term of twenty-five years. It is a remedial statute that affects future events * * *."); *People v. Elliott*, 216 N.E.3d 1101, 1116 (Ill. App. Ct. 2022) ("[O]ur legislature's 2019 enactment providing parole eligibility for offenders under age 21 convicted of serious crimes seems to have been a remedial response to the constitutional issues recognized in *Miller* for both juveniles and young adults.").

When a statute or amendment, such as Subsection (e), is deemed remedial, this Court interprets the provision liberally. *See Prew v. Employee Retirement System of City of Providence*, 139 A.3d 556, 563 (R.I. 2016). In so doing, "[w]e will not construe a remedial statute in a manner that would 'defeat its evident purpose.'" *Id.* (quoting *McCarthy v. Environmental Transportation Services, Inc.*, 865 A.2d 1056, 1062 (R.I. 2005)). Interpreting Subsection (e) liberally, and in accord with its plain language, leads to the conclusion that the General Assembly intended Subsection (e) to provide broad relief to qualified offenders.

For all these reasons, we conclude that in the context of this case, Subsection (e) mandates aggregating an offender's multiple definite and indeterminate sentences, including consecutive sentences, in order to calculate a single parole eligibility date in which "a parole permit may be issued after the person has served no fewer than twenty (20) years' imprisonment * * *." Section 13-8-13(e).

## C

## Separation of Powers

It is beyond dispute that "the [G]eneral [A]ssembly cannot under our constitution rightfully exercise judicial power." *State v. Garnetto*, 75 R.I. 86, 90, 63 A.2d 777, 779 (1949). Judicial power "is conferred only upon the courts and is necessarily prohibited to the [G]eneral [A]ssembly." *Id.*; *see also Taylor v. Place*, 4 R.I. 324, 363 (1856). The question we confront is whether the General Assembly's enactment of Subsection (e), which reduces the amount of time a qualified offender must serve in prison before becoming eligible for parole, modifies a judicial sentence or otherwise encroaches upon the judicial power. We begin with two legal principles.

First, this Court has recognized that "it is the prerogative of the General Assembly to define criminal offenses and set forth the sentences for those crimes and that when it does so, the Legislature is not intruding upon the judicial function." *Sosa v. State*, 949 A.2d 1014, 1016 (R.I. 2008) (quoting *Monteiro*, 924 A.2d at 793). In this respect,

> "[a] person imprisoned by a court is turned over to an administrative agency for the execution of the sentence. *The imprisonment can, if so authorized by the legislature, be ameliorated by allowing it to be served beyond the confines of the penal institution on parole. * * * This is not a right of a prisoner, but accrues to him through legislative grace and can be withheld or withdrawn by the legislature at will.* As part of the act of grace it is within

- 37 -

the legislative power to attach conditions to the grant of parole and to provide for the administration thereof." *Fazzano*, 96 R.I. at 478, 194 A.2d at 684 (emphasis added).

Thus, it is beyond peradventure that the General Assembly may constitutionally enact "a statutory scheme that creates a parole board and generally empower[] the parole board to grant parole to any prisoner within its control upon completion of a specified portion of the sentence imposed." *See Skawinski*, 538 A.2d at 1007.

Second, we have observed that "the imposition of a sentence by the court in a criminal case is clearly an exercise of judicial power." *Garnetto*, 75 R.I. at 91, 63 A.2d at 779. In so doing, this Court has recognized that "[t]he [G]eneral [A]ssembly has no power, since the adoption of the constitution, to annul [a] sentence * * * because that is an exercise of judicial power * * *." *Taylor*, 4 R.I. at 363; *see also Opinion of Supreme Court upon the Act to Reverse the Judgment against Dorr*, 3 R.I. 299, 301 (1854) ("The exercise, by the General Assembly, of the power to reverse the judgments of the Courts, is inconsistent with this distribution of powers, and with the existence of a distinct judicial department."); *Rose*, 92 A.3d at 907 (brackets omitted) ("'[T]he Legislature has provided by statute several methods of mitigating a defendant's sentence: suspension, probation, good-time credits, and parole,' among others.") (quoting *State v. O'Rourke*, 463 A.2d 1328, 1331 (R.I. 1983)). Against this legal landscape, we examine whether Subsection (e) annuls or modifies a judicial sentence. We conclude that it does not.

In *Rose*, the defendant was sentenced to a mandatory minimum twenty-year sentence, with eight years to serve and twelve years suspended, with probation. *Rose*, 92 A.3d at 905. After receiving credit for time served, as well as good behavior and institutional industries, Rose was released from incarceration less than four years after the imposition of his sentence and argued that his probationary period ended twelve years later. *Id.* at 905-06. Effectively, Rose argued that his full sentence expired before the twenty-year sentence imposed by the court. *Id.* at 907.

We rejected Rose's argument and invoked separation-of-powers' principles, explaining:

> "While the Legislature in § 42-56-24 clearly gave the DOC the discretion to mitigate that sentence by providing for Rose's early release from the ACI, it did not endow the DOC with the power to modify the overall length of a judicially imposed sentence * * *. Indeed, we doubt whether the General Assembly could lawfully direct the DOC to make such a reduction. While the executive branch may execute a sentence, the power to reduce the length of a sentence imposed by a justice of the Superior Court is a judicial one. * * * As a judicial power, it may not be exercised by the Legislature, either directly or indirectly." *Rose*, 92 A.3d at 910-11.

We thus recognized that were we to agree with Rose's argument, "the combined length of time that [he] will spend incarcerated and on probation will fall below twenty years," a conclusion for which there was "no authority." *Id.* at 909 n.10.

Here, Subsection (e), as interpreted, neither modifies nor alters respondents' judicial sentences. The respondents acknowledge as much, arguing to this Court

- 39 -

that "Monteiro will always be sentenced to consecutive life terms, regardless of whether he is imprisoned or paroled to the community." We agree and observe that in Rhode Island, it has long "been assumed * * * that parole acts, using the term generically, are constitutional and that it is clearly within the legislative power to ameliorate a judicial sentence." *Fazzano*, 96 R.I. at 480, 194 A.2d at 685.

It is true, as the state submits, that Subsection (e), as interpreted, may allow a qualified offender to be paroled to the community before a consecutive sentence becomes operative. Rhode Island permitted such a scenario long before Subsection (e) was enacted. *See, e.g.*, § 13-8-10(a) ("If a prisoner is confined upon more than one sentence, a parole permit may be issued whenever he or she has served a term equal to one-third (⅓) of the aggregate time which he or she shall be liable to serve under his or her several sentences * * *."). This result, the state contends, alters or modifies the judicially imposed consecutive sentence and offends the separation-of-powers doctrine. The state is mistaken.

In this context, we examine Subsection (e) for its constitutionality, not its wisdom. When viewed through this lens, "[t]he imprisonment can, if so authorized by the legislature, be ameliorated by allowing it to be served beyond the confines of the penal institution on parole." *Fazzano*, 96 R.I. at 478, 194 A.2d at 684; *see also Graham*, 560 U.S. at 70 ("'[P]arole is an established variation on imprisonment of convicted criminals,' it was evident that an analysis of the petitioner's sentence

- 40 -

'could hardly ignore the possibility that he will not actually be imprisoned for the rest of his life.'") (quoting *Rummel v. Estelle*, 445 U.S 263, 280-81 (1980)); *Anderson v. Corall*, 263 U.S. 193, 196 (1923) ("The parole authorized by the statute does not suspend service or operate to shorten the term. While on parole the convict is bound to remain in the legal custody and under the control of the warden until the expiration of the term * * *."); *State v. Desjarlais*, 731 A.2d 716, 718 (R.I. 1999) ("[S]entencing a person to home confinement as opposed to incarceration in a correctional facility is merely a 'change in the place where he or she is confined.'") (quoting *State v. Mariano*, 648 A.2d 803, 804 (R.I. 1994)); *State v. McCleese*, 215 A.3d 1154, 1180 (Conn. 2019) ("The legislature did not change the length of the defendant's sentence, but rather provided him with the possibility of parole."). Because a prisoner at liberty under Subsection (e) remains in the custody of the warden outside the confines of the prison, Subsection (e) does not alter the judicially imposed sentence, nor does the amendment infringe upon the judicial power. As such, it is the responsibility of the DOC to determine a single parole eligibility date for all offenders and the responsibility of the parole board to grant a parole permit to prisoners *to be at liberty on parole*, not to another sentence.[16]

---

[16] In light of this conclusion and with the benefit of this opinion, we expect that the DOC will recalculate parole eligibility for any qualified offender "eligible for parole review" pursuant to § 13-8-13(e) and refer those prisoners to the parole board for review.

We recognize that "[i]n a sophisticated sentencing scheme, such as ours, there are many permutations of possible sentences. We confine ourselves, however, to our proper role of resolving only the questions presented to us in the instant [matter] * * *." *Rose*, 92 A.3d at 913. Accordingly, our interpretation and constitutional conclusions are limited to the cases before us. As an example, in *State v. Mattatall*, 219 A.3d 1288 (R.I. 2019), the defendant was convicted of second-degree murder and sentenced to sixty years' imprisonment, with fifty years to serve and ten years suspended, with probation. *See Mattatall*, 219 A.3d at 1290. Significantly, the defendant in that case "also received an additional sentence of twenty years to serve as a habitual offender, which, importantly and as expected, was ordered to be served consecutively to the sentence for second-degree murder. *The habitual offender sentence was to be nonparolable for the first eighteen years of the sentence*." *Id.* (emphasis added); *see also* § 12-19-21.

This Court explained in *Mattatall* that, due to an error in the judgment, after the defendant served more than thirty-two years in prison for a fifty-year sentence, he was granted parole but "the minutes from that parole board hearing reflect[ed] uncertainty concerning whether defendant was eligible for release or whether he was

- 42 -

to be paroled to begin serving the nonparolable eighteen-year habitual offender sentence." *Mattatall*, 219 A.3d at 1291.[17]

Although we deem it unnecessary to provide an exhaustive list of statutes that similarly allow or require a trial justice to impose a nonparolable sentence, the habitual offender statute does not stand alone. *See, e.g.*, G.L. 1956 § 11-47-3.2(a) ("Any sentence imposed upon a person pursuant to this section shall be imposed consecutively to and not concurrently with any sentence imposed for the underlying crime or attempted crime, *and the person shall not be afforded the benefits of deferment of sentence or parole*; provided, that unless sentenced to life without the possibility of parole pursuant to subdivision (3) of this subsection, a person sentenced to life under this section may be granted parole.") (emphasis added).[18] In

---

[17] In an exercise of our supervisory authority, this Court ameliorated the error in the judgment by permitting Mattatall to file a motion to reduce that sentence within 120 days of the date of the opinion. *See State v. Mattatall*, 219 A.3d 1288, 1294 (R.I. 2019).

[18] We pause to note that in an effort to curb gun violence, the General Assembly has enacted mandatory consecutive sentence provisions for firearm offenses, which critically allow *no* discretion to the judicial officer imposing these lengthy sentences. One such provision, § 11-47-3.2 pertains to the use of a firearm during the commission of a crime of violence and mandates, *inter alia*, that "[a]ny sentence imposed upon a person * * * shall be imposed consecutively to and not concurrently with any sentence imposed for the underlying crime or attempted crime * * *." We observe that both the current version of this provision, and its precursor upon which Monteiro was convicted and sentenced, provide that unless sentenced to life in prison, a "person shall not be afforded the benefits of deferment of sentence or parole * * *." *See* § 11-47-3.2; P.L. 2000, ch. 158, § 2; P.L. 2000, ch. 285, § 2. Because Monteiro was sentenced to life imprisonment pursuant to then-§ 11-47-3.2,

such circumstances, the DOC must calculate a single parole eligibility date by aggregating an offender's sentences; thus, in Mattatall's situation, parole eligibility on the second-degree murder conviction (ten years' imprisonment) would be aggregated with the mandatory term on the habitual offender conviction (eighteen years of which was ordered to be nonparolable). But for the scrivener's error in the judgment, the result should have been a single parole eligibility date for the potential release to the community on all offenses after twenty-eight years.

Statutes or judicial sentences imposing nonparolable prison terms or mandatory minimum incarceration terms present additional issues not specifically contemplated in this opinion. As one court has noted, while "'the precise time at which the offender becomes eligible for parole is not part of the sentence,' where the statute defining the offense precludes parole eligibility for a mandatory period of time, 'it is implicit in the terms of the sentence' and, thus, affects the prosecution." *Fields v. Missouri Board of Probation and Parole*, 559 S.W.3d 12, 19 (Mo. Ct. App. 2018) (quoting *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 658 (1974)). Accordingly, although we are cognizant of this analysis, we take no position on issues that are not before us and abide by the mandatory eligibility period set forth by the General Assembly and our judgments.

---

Monteiro's eligibility for parole posed no constitutional infringement on the separation-of-powers doctrine.

# D

## The Orders Immediately Paroling Respondents

Finally, although we agree with the trial justice that Subsection (e) requires aggregating an offender's multiple definite and indeterminate sentences, including consecutive sentences, in order to calculate parole eligibility; and that Subsection (e) does not violate the separation-of-powers doctrine, we nonetheless are of the opinion that the trial justice exceeded his authority by ordering each respondent immediately paroled to the community. This Court has staunchly adhered to "the 'hands-off' policy which has traditionally been invoked when dealing with [p]arole [b]oard proceedings and the overall reluctance to interfere with what must necessarily be highly discretionary decisions." *State v. Ouimette*, 117 R.I. 361, 363, 367 A.2d 704, 706 (1976). We continue to adhere to that policy.

In his bench decision, the trial justice explained that "[b]ased upon the unanimous decisions of the [p]arole [b]oard that [Neves and Nunes] satisfied the criteria for parole, [each] should have been issued a parole permit to the community on or shortly after July 6, 2021 * * *." The trial justice added that Subsection (e) "entitles each [respondent] to immediate release. Therefore, the [c]ourt orders that each [respondent] shall be immediately released from incarceration at the Adult Correctional Institutions to parole, to be at liberty in the community, upon such terms

and conditions as previously or hereinafter set by the [p]arole [b]oard." This was clear error.

The trial justice ordered that Neves "is hereby ordered immediately released from incarceration to be at liberty on parole upon the terms and conditions set by the [p]arole [b]oard by unanimous vote on August 21, 2021." The parole board ordered no such relief. Instead, the record indicates that on or about August 21, 2019, the parole board

> "*vote*[*d*] *to parole* [*Neves*] *August 2021 to his next consecutive sentence.* \* \* \* *We will consider him when he is next eligible on his ten year consecutive sentence* and we will also schedule a review date in August 2021 to review and assign any special conditions of parole for his Life sentence." (Emphasis added.)

As the trial justice noted, on or about August 23, 2021, the parole board conducted a review, but it never voted to parole Neves to the community and instead issued a parole permit that Neves was paroled *to his consecutive sentence*.

The trial justice also decreed that Nunes "is hereby ordered to be immediately brought before the [p]arole [b]oard to determine the terms and conditions for his release from incarceration to be at liberty on parole and to be thereafter released from incarceration to be at liberty on parole in accordance with such terms and conditions." Nunes last appeared before the parole board on or about June 17, 2019, approximately two years before the enactment of Subsection (e). At that time, the parole board voted to parole Nunes "from this Life Sentence *to his next Consecutive*

*Sentence of ten years.*" (Emphasis added.) A parole permit issued in September 2019, directing that Nunes be paroled to his consecutive sentence, not the community. The parole board further indicated that Nunes "will be reviewed in November 2022 to determine conditions of parole on the Life Sentence," but the record does not reflect that a subsequent review ever materialized.

Finally, the trial justice ordered that Monteiro be "immediately brought before the [p]arole [b]oard to confirm the terms and conditions for his release from incarceration to be at liberty on parole set in December 2021 with review after December 2022 and to be thereafter released from incarceration to be at liberty on parole in accordance with such terms and conditions." When Monteiro last appeared before the parole board on or about October 19, 2022, the parole board acknowledged "an existing legal debate in court on the application of this consecutive term – whether it is aggregated and consumed by the first life sentence eligibility or whether he has yet to and must serve this next term." The parole board voted

> "to parole Mr. Monteiro from his first life sentence. If it is determined that he must serve another consecutive life term, then the effective parole release date shall be the date of this decision (December 15, 2021). If it is determined that he is eligible for immediate release to the community, then the effective parole release date shall be *no sooner than December 2022.*" (Emphasis added.)

- 47 -

The parole board further detailed its reasoning for the staggered release date, if Monteiro was paroled to the community: "[T]he Board believes there should be some time for Mr. Monteiro to transition to a lower security and preparation for eventual release."

In applying Subsection (e), the trial justice improperly equated each respondent's grant of parole to a consecutive sentence with a vote by the parole board, after due consideration, that each respondent be at liberty on parole. To the contrary, this Court has previously recognized:

> "Pursuant to G.L. 1956 § 13-8-21, all permits and orders of the parole board issued under chapter 8 of title 13 must be signed by the chairperson and one other member of the parole board and must be affixed with the seal of the board. *Only at the point when the permit has been signed, sealed, and issued is the permit for parole given full recognition.*" *Yang v. State*, 703 A.2d 754, 756 (R.I. 1997) (affirming parole board decision to rescind parole when permit had not been signed or issued) (emphasis added).

Because Neves and Nunes[19] each possessed a "signed, sealed, and issued" permit granting parole to each of their respective *consecutive sentences*, and not the community, the trial justice was without authority to order the parole board to order

---

[19] The record does not contain a parole permit for Monteiro but we presume that if one was issued, the terms are consistent with the parole board's minutes.

these respondents to be immediately released when the parole board itself had not issued a permit to be at liberty on parole.[20]

In this sense, we offer a critical reminder that Subsection (e), as interpreted, provides a qualified offender only the opportunity to appear before the parole board; it does not provide a qualified offender the right to be paroled. Accordingly, the trial justice erred when he ordered the parole board to immediately parole respondents to the community.

**Conclusion**

For the reasons discussed herein, the judgments are affirmed in part and vacated in part. On remand, the Superior Court is directed to dismiss the postconviction-relief application filed by Ortega as moot. With respect to Neves, Nunes, and Monteiro, the Superior Court is directed to remand these cases to the parole board, which shall, if necessary, consider Neves, Nunes, and Monteiro for a permit to be at liberty on parole and set any conditions it deems fit. The papers in this case are remanded to the Superior Court for further proceedings consistent with this opinion.

---

[20] *See* § 13-8-9(a) ("The parole board * * * may, by an affirmative vote of a majority of the members of the board, issue to that prisoner *a permit to be at liberty upon parole*, whenever that prisoner has served not less than one-third (⅓) of the term for which he or she was sentenced.") (emphasis added).

**Justice Robinson, dissenting.** I respectfully dissent. Try as I might, I am simply unable to agree with the majority's reading of G.L. 1956 § 13-8-13(e) (Subsection (e)).

I hasten to acknowledge in all sincerity that the majority opinion is as scholarly as it is exhaustive, and it has caused me to think long and hard before penning this brief dissent. I also wish to state that I have found this to be an extraordinarily close case, and I readily admit that I could be wrong. Upon first reading the statute at issue, it certainly was not immediately apparent to me, as a matter of statutory interpretation, that the inherently ambiguous term "any offense" in the phrase "[a]ny person sentenced for any offense committed prior to his or her twenty-second birthday"[1] applies to the named respondents in this case. In addition, and very importantly, I do not perceive any indication in the text of the statute that the General Assembly deliberately opted to base such a radical new change in some aspects of the law regarding parole on so minimal a linguistic basis. Although the majority's efforts to broadly construe the term "any offense" in Subsection (e) are thought-provoking, they have failed to convince me. While admitting that it is a close call, I have concluded that "any offense" means one single offense.

---

[1] I am aware that the referenced sentence in Subsection (e) goes on to exempt from its reach "a person serving life without parole." However, that additional language is not at issue in this case.

While the majority opinion does not expressly state that the term in question ("any offense") is ambiguous, it is clear to me that that is how the majority views that term before embarking on its extensive and impressive foray into statutory interpretation. Indeed, I believe that we are confronted with a classic instance of ambiguity. *See, e.g.*, *Drs. Pass and Bertherman, Inc. v. Neighborhood Health Plan of Rhode Island*, 31 A.3d 1263, 1269 (R.I. 2011) ("Ambiguity exists * * * when a word or phrase in a statute is susceptible of more than one reasonable meaning."); *see also Middle Creek Farm, LLC v. Portsmouth Water & Fire District*, 252 A.3d 745, 751 (R.I. 2021) (noting that a "statute is ambiguous if one of its words or phrases is susceptible to more than one meaning").[2]

---

[2] The opinion of Justice Breyer in the case of *Small v. United States*, 544 U.S. 385 (2005), strikingly illustrates the inherent ambiguity in many situations where "any" is used to modify a noun. In that case, Mr. Small had been convicted under a federal criminal statute that makes it "unlawful for any person * * * who has been *convicted in any court* of, a crime punishable by imprisonment for a term exceeding one year * * * to * * * possess * * * any firearm." *Small*, 544 U.S. at 387 (emphasis in original) (quoting 18 U.S.C. § 922(g)(1)). It was uncontested that Mr. Small had previously been convicted in a Japanese court of attempting to "smuggle several pistols, a rifle, and ammunition into Japan." *Id.* He was sentenced to five years' imprisonment. *Id.* In spite of the arguably definitive nature of the term "convicted in any court," the Supreme Court held that "the phrase 'convicted in any court' refers only to domestic courts, not to foreign courts." *Id.* at 394. The *Small* case is relevant to the case at bar in its own right and for its discussion of the ambiguity of the word "any" and for its citation to a number of Supreme Court opinions discussing that word. *Id.* at 388-89. Notable among those cited cases is *Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004), wherein the Court comments that "any" means "different things depending upon the setting." *Id.*; *Nixon*, 541 U.S. at 132; *see generally United States v. Palmer*, 16 U.S. 610 (1818) (Marshall, C.J.).

In my judgment, when the General Assembly opted to exercise legislative grace[3] by decreeing that certain youthful offenders might be eligible for parole consideration earlier than would otherwise be the case, that grace applied only to a youthful offender who had been sentenced for a single offense. I am unable to agree that the words "any offense" should be read to apply to a person who was sentenced for having committed more than one offense. If the General Assembly had deliberately opted to exercise legislative grace towards youthful offenders serving sentences for having committed multiple offenses, it would have been a straightforward and easy task to draft statutory language that would make reference to a youthful offender sentenced to "any offense or offenses," but the undeniable fact is that the statute before us speaks only in the singular: "any offense."[4]  I certainly

---

[3]     *See State v. Fazzano*, 96 R.I. 472, 478, 194 A.2d 680, 684 (1963) (stating that the possibility of parole is extended to certain offenders "through legislative grace and can be withheld or withdrawn by the legislature at will").

[4]     It appears to be undisputed that the word "any" has two different permissible uses in standard English—always dependent on context. *See generally Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1013 (7th Cir. 1984) (en banc) (Posner, J.) ("[C]ontext, in the broadest sense, is the key to understanding language.").

Subsection (e) is illustrative of that point. I think that there would be universal agreement that the words "Any person" at the beginning of the sentence in question do not signify that only one person would be entitled to invoke the provisions of Subsection (e). On the other hand, I am confident that even those who disagree with this dissent would not contend that my reading of "any offense" as applying only to an offender sentenced for just one single offense is completely implausible.

do not question the right of the General Assembly to have enacted a statute referring to "any offense or offenses," but that is not how the statute before us reads.

It is not customary for the General Assembly to be less than completely clear when enacting such an important piece of legislation as Subsection (e) quite obviously is—especially if one reads it as the majority does. As just one example of how the General Assembly ordinarily takes pains to be very clear when enacting major changes to existing legal criteria, I would point to what this Court said with respect to the legislative repeal of the "illusory transfer test" in the realm of trust and estates. In that instance, this Court went out of its way to note that, in mandating that repeal, the General Assembly had employed "clear, precise, and broad language * * *." *Barrett v. Barrett*, 894 A.2d 891, 898 (R.I. 2006). With all due respect, I doubt that any objective commentator would use those adjectives to describe the language at issue in the instant case.

When one considers the gravity of the several offenses for which the respondents were sentenced, I am unable to conclude that, simply by employing the inherently ambiguous term "any offense," the General Assembly intended to declare them all to be eligible for parole consideration. I concede that legislating to that effect would be within the General Assembly's competence, but I am simply unable to conclude that the General Assembly did so in this instance in such an abbreviated and unclear manner. I do not exclude the possibility that that is what the General

Assembly actually intended; however, I would need much more explicit language before I could reach that conclusion—even employing the liberal reading that is to be used in the interpretation of remedial legislation. *See Grasso v. Raimondo*, 177 A.3d 482, 491 (R.I. 2018) (referring to "the oft-repeated metaphorical maxim * * * to the effect that a legislature, in enacting statutes, is not wont to 'hide elephants in mouseholes'") (quoting *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 468 (2001)); *see also Food and Drug Administration v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.").

I see nothing absurd in my reading of the statute. It would not be at all illogical for the General Assembly to exercise grace vis-à-vis individuals who had been found guilty and sentenced for one single instance of bad judgment while being far less lenient vis-à-vis individuals who were sentenced for numerous offenses—as is the situation of the instant respondents.[5] And it should be remembered that Subsection

---

[5]    I certainly do not contend that the majority's interpretation of the ambiguous term "any offense" is arbitrary or irrational. Instead, it is my position that that interpretation too readily assumes that the General Assembly would base so sweeping a policy change on an inherently ambiguous term that consists of just two words.

(e) applies not only to the present respondents but also to other youthful offenders in the future.

For the foregoing reasons, I conclude that the phrase in Subsection (e) "[a]ny person sentenced for any offense committed prior to his or her twenty-second birthday" does not apply to a person in that age group who has been sentenced for having committed more than one offense.[6] In my judgment, the term "any offense" in the context of Subsection (e) means any one offense.[7]

I conclude this dissent as I began it—by stating that I have genuine respect for the majority's careful analysis and its articulate explanation of how it understands Subsection (e). Nevertheless, after considerable soul-searching, I remain unpersuaded. I am simply unable to conclude that the inherently ambiguous term "any offense" can properly be read in the broad manner in which the majority has opted to read it. I repeat that I readily acknowledge that the General Assembly has the power to legislate in the manner in which the majority has construed Subsection

---

[6] The General Assembly is, of course, free to amend Subsection (e) if the thoughts set forth in the majority opinion or in this dissent persuade it to do so. *See Air Distribution Corp. v. Airpro Mechanical Company, Inc.*, 973 A.2d 537, 542 (R.I. 2009); *Brown & Sharpe Manufacturing Company v. Dean*, 89 R.I. 108, 117, 151 A.2d 354, 359 (1959).

[7] Since I disagree with the majority as to the meaning of Subsection (e), I need not and do not express any view as to the other issues addressed in the majority opinion.

(e); it is just that I do not believe that the General Assembly has exercised that power

in this instance.  I could be wrong, but this is my view.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | Joao Neves v. State of Rhode Island. Keith Nunes v. State of Rhode Island. Pablo Ortega v. State of Rhode Island. Mario Monteiro v. State of Rhode Island. |
| **Case Number** | No. 2022-92-M.P. (PM 22-259) No. 2022-93-M.P. (PM 22-901) No. 2022-94-M.P. (PM 22-260) No. 2023-167-M.P. (PM 23-921) |
| **Date Opinion Filed** | July 2, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Stephen P. Nugent |
| **Attorney(s) on Appeal** | For Petitioner: Christopher R. Bush Department of Attorney General |
| | For Respondents: Lynette J. Labinger, Esq. |